771 A.2d 1220

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. MARLON A. MARYLAND, DEFENDANT–
APPELLANT.

Argued November 8, 2000—Decided June 5, 2001.

472

474

---

*Frank J. Pugliese,* Assistant Deputy Public Defender, argued the cause for appellant (*Ivelisse Torres,* Public Defender, attorney).

*Steven J. Kaflowitz,* Assistant Prosecutor, argued the cause for respondent (*Thomas V. Manahan,* Union County Prosecutor, attorney).

*Robert E. Bonpietro,* Deputy Attorney General, argued the cause for amicus curiae, Attorney General of New Jersey (*John J. Farmer, Jr.,* Attorney General, attorney).

The opinion of the Court was delivered by

COLEMAN, J.

This is a warrantless search and seizure case in which defendant contends that he was selected for questioning by the police because of his race. The trial court declined to address that claim in denying defendant's motion to suppress evidence filed pursuant to *Rule* 3:5–7, and a divided Appellate Division affirmed. We reverse.

We consider the question whether defendant was selected for questioning because of his race to be critical. We hold that although a field inquiry may be conducted when the police have not observed the individual approached for questioning engage in any suspicious activities, such an inquiry is impermissible if it is race based. Our review of this record, moreover, persuades us that the police action of which defendant complains is not reasonably understood as anything but such a proscribed race-based inquiry.

I.

The facts in this case were developed at a hearing on a motion to suppress evidence seized from the person of defendant. The evidence presented by the State reveals substantial internal conflicts and contradicts evidence presented by the defense. The following is a summary of that conflicting evidence.

On October 2, 1995, defendant Marlon Maryland and his step-brother, K.R., a juvenile, arrived at the Rahway train station on a New Jersey Transit (N.J.Transit) train at approximately 5:50 p.m. along with other rush-hour commuters. Defendant and K.R. exited the westbound train with the other passengers. Meanwhile, two undercover N.J. Transit police officers, Paul Marshall and Patrick Clark, were patrolling the Rahway train station for the purpose of preventing vandalism and graffiti. The officers wore plain clothes, "jeans, sweat shirt, sneaker type, with a knapsack, just dressed like a commuter."

Officers Marshall and Clark both testified at the suppression hearing that they noticed defendant shove a brown paper bag into the waistband of his pants as he exited the train. Officer Marshall explained that he "was approximately ten feet, 15 feet away," when he saw defendant lift "his sweat shirt type and place [a brown paper bag] right about into his waistband area." Officer Marshall also testified that a third person accompanied defendant and K.R., although they denied knowing that individual. Officer Marshall said that "[t]hey were all walking together as if they

were in a conversation with each other at a slow pace, nothing unusual. They were just moving slowly, moving toward the exit of the stairwell." The officers thought it was "very, very unusual that a male would stick something into his waist area like that," and they suspected defendant was "trying to conceal something[,] ... either a weapon or contraband."

The officers approached defendant and the two other individuals at the bottom of the stairs and identified themselves as police officers. Officer Marshall stated: "I would like to speak to you individuals for a minute." Officer Marshall asked defendant what his name was and where he had come from. Officer Marshall testified that his suspicions were further aroused when defendant replied that he had just arrived from Jersey City, because there are no direct trains from Jersey City to Rahway. Although that is technically correct, Officer Marshall conceded on cross-examination that one can travel from Jersey City to Rahway by switching from the PATH train to an N.J. Transit train in Newark. Officer Marshall then inquired of the three men: "Are you carrying anything you shouldn't be carrying?" The officers testified that defendant then turned his body slightly and reached into his waistband area, prompting Officer Marshall to lunge for and grab defendant's hands. A brief struggle ensued and several bags containing marijuana spilled onto the ground.

Defendant testified in direct conflict with the police officers' observations. Defendant maintains that he placed the brown paper bag into his waistband while he and K.R. were still in Jersey City, not when he stepped off the train in Rahway. He asserts that the police officers approached him in the station and asked him several questions. Defendant claims, however, that the police threw the trio against the wall after defendant said they had traveled from Jersey City. Defendant contends that one of the officers grabbed him and asked to see a radio he was holding in one hand. That officer inspected the radio and, after finding nothing, placed it on the ground and searched defendant. That officer then found the brown paper bag in defendant's pants.

The defense called K.R., who was arrested with defendant, as a witness. K.R. testified that he and defendant were walking in the direction of the train station steps when the police grabbed them from behind and told them to stand against a wall. K.R. testified that Officers Marshall and Clark identified themselves as police officers and immediately began searching them. K.R. testified that defendant had a radio in one hand. Although he never saw defendant with a brown paper bag in his hand, K.R. observed one of the police officers retrieve a paper bag from "[b]elow [defendant's] belt area."

Defense counsel argued in summation that this case turned on credibility because the prosecution offered three different versions of what had transpired in the train station and the defense offered still another version. In support of her position that the police officers' testimony should not be believed, defense counsel pointed to internal contradictions in the various police reports and the State's brief filed in opposition to the suppression motion. In his initial police report, Officer Marshall did not provide any reason for approaching defendant and his companions at the Rahway train station. Most notably, there was no mention in the report of defendant placing a brown paper bag in his pants before the officers approached defendant and his companions. That initial report, which was prepared contemporaneously with the arrest, described the stop as follows:

On 10-02-95 at 1750 hrs NJ Transit PD Anti–Crime Unit members P/O Clark and P/O Marshall [were] assigned a detail at N.J. Transit Rahway Train Station, Rahway[,] New Jersey.

The above officers were questioning three B/M/A when P/O Marshall observed defendant turn his body away from P/O's and attempt[ ] to push a brown bag deeper into his front pants.

Defense counsel also stressed that the State's brief, submitted twelve days before the suppression hearing, did not assert that the officers saw defendant place the bag into his pants. Instead, the brief states that Officers Marshall and Clark were aware of "a high incidence of narcotics activity at the train station, including the use of drugs and transporting of narcotics by train to Rah-

way." The brief also states that the officers had seen defendant and his companions at the station about one week earlier. In its brief the State contends that the reason for stopping defendant and his companions was the presence of three young black males at the station a second time in a week. The stop was made on a Monday during peak commuter rush-hour traffic.

Defense counsel emphasized that the version of events in which the officers allegedly observed defendant placing the brown bag into his pants as he exited the train first appeared in an arrest report that was prepared, according to defense counsel, approximately four days before the suppression hearing. That report is not dated. It was around that time that Officers Marshall and Clark met with two assistant prosecutors handling the suppression motion. Also according to defense counsel, after that meeting, an arrest report was prepared by Officer Clark. It states:

> Actor observed exiting a N.J. Transit Train [a]t Rahway Station and place [sic] a brown bag in his waist band. When actor was stopped for questing [sic], actor pushed the Officer in an attempt to flee the seean [sic]. Actor was apprehended and found to be in possession of 33 bags of Marijuana and 100 vi-caps.

Counsel for defendant urged the trial court to grant the suppression motion by resolving the credibility issues against the police officers because there were at least three inconsistent versions presented by the State concerning what transpired at the train station. Counsel argued that the State's inconsistent and contradictory versions resulted from an attempt to conceal the real reason for the stop: that defendant and his companions were stopped because they were three young African American males who met the drug courier profile. The trial court declined to address that issue, stating "[t]hat's not part and parcel of this record."

The judge presiding over the suppression motion made the following factual findings and legal conclusions:

> Credibility is in issue clearly in this case. I heard all the witnesses and I make the following facts in my mind credible: Officer Marshall and his colleague, Officer Clark, were, indeed, working as transit police officers in Rahway on that date and time, in plain clothes, looking to prevent difficulties from occurring there.

On the date in question, which is 10/5/95 [sic], at around 5:50, the defendant and his colleague, [K.R.], and a third person who they say they don't know came out on the train.

I find it credible [that] ... when they came out on the train Officer Marshall, indeed, saw this defendant place the brown bag into his waistband and the three men went down the steps and the officers followed them. The officers stopped them and spoke to them. They have a right to talk to them. They didn't do anything beyond talking to them. They had no right at that time to do anything beyond talk to them. They had no right to search them at all.

Where the officers indicate that the events occurred and the defendants indicate they were patted down without any provocation, I find the credible fact in my mind to be that Officer Marshall saw this defendant make a turning movement and reaching toward his belt area and he had a right and a reasonable basis to believe a weapon might be in that area, based upon his experience as a police officer where he seized weapons in the past. He then reached toward that area to attempt to make sure there's no weapon and that's when the item came out.

We're not talking about a ballet that takes five minutes where movements are extended, slow, very distinct. We're talking about a very fast act. Reaching into an area of a man's beltline and checking for a weapon and the package comes out, that package spills out, and that's what happened here. I find that to be credible.

I do not believe [the] young men when they said they were patted down and put on the side and told to assume the position for no reason at all and they did nothing wrong other than perhaps going to New York to buy drugs. Those young men, this defendant and [K.R.], in my view, having had prior convictions which were put on the record, do not at this point have credibility to me. I have heard them. I heard the police officer. On the credibility call, I find the police officers are more credible than these two young defendants.

Having made that determination, that the police officer had a right to talk to them, and in the course of doing so this defendant made a movement toward this waist, the officer thought it was a threat potentially to him so the officer had a right to protect himself and his partner by checking that out and putting his hands in this area. That's when the drugs came out.

Further, the officer testified that when they came out, he smelled an odor of marijuana and thereby seized the defendant's body. But, of course, the defendant bolted at that time and ran away. He was apprehended, brought back to headquarters and obviously charged on this particular issue.

As to the other contraband found, Marshall doesn't know where and we now know Clark found it and he found it in an area as he indicated in his testimony. He found the caps and he found rubber bands in a pat down at the scene when he apprehended the defendant several blocks from the incident.

For these reasons, in my mind this search was not improper or unconstitutional and the Motion to Suppress is denied.

After the denial of the suppression motion, defendant pled guilty to possession of marijuana with intent to distribute within

1,000 feet of a school, in violation of *N.J.S.A.* 2C:35–7. Defendant was sentenced on July 25, 1997, to a custodial term of five years with thirty months of parole ineligibility. He filed an appeal with the Appellate Division on July 13, 1998, challenging his sentence and the denial of his suppression motion.

The Appellate Division upheld the judgment of conviction in a published opinion. *State v. Maryland,* 327 *N.J.Super.* 436, 743 *A.*2d 876 (2000). Judge Kestin, in a dissenting opinion, concluded that the credible evidence did not describe circumstances "that justified the stop and inquiry of defendant" and found that "[e]very other significant factual event flowed as a consequence from that action. Therefore, nothing that occurred after the invalid stop may be seen to have generated competent evidence." *Id.* at 457, 743 *A.*2d 876 (Kestin, J.A.D., dissenting). Judge Kestin would have suppressed the evidence, clearly implying that the State's inconsistent and contradictory versions of why defendant was approached in the first instance precluded the State from sustaining its burden of proving the constitutional validity of the stop. This appeal is before this Court by virtue of that dissent. *R.* 2:2–1(a)(2).

II.

■ We begin our analysis by focusing on the law controlling the validity of the initial questioning of defendant in the Rahway train station. The starting point is the Fourth Amendment of the United States Constitution and Article I, paragraph 7 of the New Jersey Constitution. Those similarly worded provisions protect citizens against unreasonable police searches and seizures by requiring warrants issued upon probable cause "unless [the search] falls within one of the few well-delineated exceptions to the warrant requirement." *Schneckloth v. Bustamonte,* 412 *U.S.* 218, 219, 93 *S.Ct.* 2041, 2043, 36 *L.Ed.*2d 854, 858 (1973); *State v. Citarella,* 154 *N.J.* 272, 278, 712 *A.*2d 1096 (1998).

## A.

 Irrespective of whether the police officers saw the defendant place a brown paper bag in the waistband of his pants, absent any impermissible reason for questioning defendant, the officers were permitted to make a field inquiry "without grounds for suspicion." *State v. Contreras,* 326 *N.J.Super.* 528, 538, 742 *A.*2d 154 (App.Div.1999). As we explained in *State v. Sheffield,* 62 *N.J.* 441, 447, 303 *A.*2d 68, *cert. denied,* 414 *U.S.* 876, 94 *S.Ct.* 83, 38 *L.Ed.*2d 121 (1973), "mere field interrogation, without more, by a police officer does not involve 'detention' in the constitutional sense so long as the officer does not deny the individual the right to move." Without a detention by the police, the Fourth Amendment is simply not implicated in such cases:

[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds. If there is no detention—no seizure within the meaning of the Fourth Amendment—then no constitutional rights have been infringed.

[*Florida v. Royer,* 460 *U.S.* 491, 497–98, 103 *S.Ct.* 1319, 1324, 75 *L.Ed.*2d 229, 236 (1983) (citations omitted).]

 Whether a detention has occurred is measured from the citizen's perspective. *State v. Tucker,* 136 *N.J.* 158, 165–66, 642 *A.*2d 401 (1994). Hence, Officer Marshall's conclusory testimony at the suppression hearing that defendant "was free to leave" is not probative. The correct inquiry is whether defendant, under all of the attendant circumstances, reasonably believed he could walk away without answering any of Officer Marshall's or Clark's questions. We have previously noted that "an officer would not be deemed to have seized another if his questions were put in a conversational manner, if he did not make demands or issue

orders, and if his questions were not overbearing or harassing in nature." *State v. Davis,* 104 *N.J.* 490, 497 n. 6, 517 *A.*2d 859 (1986) (citing 3 Wayne R. LaFave, *Search and Seizure,* § 9.2 at 53–54 (1978)); *see also State ex rel. J.G.,* 320 *N.J.Super.* 21, 30, 726 *A.*2d 948 (App.Div.1999) (stating when police officer asks an individual whether he is carrying "anything on him that he shouldn't have," the question converts field inquiry into detention).

 In the present case, it is not clear whether the trial court concluded that a detention occurred when the police officers first approached defendant and his companions at the bottom of the platform steps. On the one hand, the trial court remarked that the officers "stopped" the three men. On the other hand, the court observed that the officers "didn't do anything beyond talking to them." Having found that a proper search was conducted pursuant to *Terry v. Ohio,* 392 *U.S.* 1, 22, 88 *S.Ct.* 1868, 1880, 20 *L.Ed.*2d 889, 906 (1968), the court did not address whether a valid field inquiry had been conducted and, if so, whether its scope was exceeded. That was improper because, unless the initial questioning was valid, the subsequent *Terry* search cannot withstand constitutional scrutiny.

### B.

 A proper field inquiry may be conducted even when the police have not observed the individual approached for questioning engage in suspicious activities so long as the individual is free to leave. However, the questioning of defendant as part of a field inquiry is not sustainable if the officers approached him and his companions solely because of their race and age. Although a field inquiry may be conducted in the absence of grounds for suspicion without violating the Fourth Amendment or Article I, paragraph 7 of the New Jersey Constitution, that does not mean the police may rely on impermissible criteria to question individuals.

 The Equal Protection Clause of the Fourteenth Amendment requires that the selection of a person for a field inquiry, referred to as a consensual encounter with the police in some of the federal cases, may not be based solely on that person's race absent some compelling justification that pre-existed the police approaching the individual. *United States v. Woods,* 213 *F.*3d 1021, 1022–23 (8th Cir.2000); *United States v. Travis,* 62 *F.*3d 170, 174–75 (6th Cir.1995), *cert. denied,* 516 *U.S.* 1060, 116 *S.Ct.* 738, 133 *L.Ed.*2d 688 (1996); *see also Whren v. United States,* 517 *U.S.* 806, 813, 116 *S.Ct.* 1769, 1774, 135 *L.Ed.*2d 89, 97 (1996) (explaining that Equal Protection Clause "prohibits selective enforcement of the law based on considerations such as race"). We reach the same conclusion under Article I, paragraphs 1 and 5 of the New Jersey Constitution. *State v. Kennedy,* 247 *N.J.Super.* 21, 29–31, 588 *A.*2d 834 (App.Div.1991). The objective reasonableness standard for deciding the constitutionality of a search articulated in *State v. Bruzzese,* 94 *N.J.* 210, 219, 463 *A.*2d 320 (1983), is not satisfied when the only reason for the search is the individual's race. For the same reason, a field inquiry or an investigatory stop predicated solely on race would be equally defective. *Id.* at 226, 463 *A.*2d 320.

 In this case, based on in-court testimony, the trial court found that the officers had observed defendant place a brown paper bag into his pants before approaching him. Yet, under the version of the facts contained in the first police report, there was no assertion that either police officer saw defendant place a bag into his pants before they both approached him. Further, although the version of events put forward in the State's brief is not evidential, its content can be judicially noticed. *N.J.R.E.* 201(b)(4); *State v. Marshall,* 123 *N.J.* 1, 207, 586 *A.*2d 85 (1991). Under that version, the police officers approached defendant only because he was one of three young black males the officers had seen at the train station a week earlier. If true, that would establish an irrebuttable inference of invidious and selective law enforcement because defendant's race would then have been the

sole basis for the approach. We find it disturbing that the State contested the suppression motion while at the same time unmistakably relying on race as the basis for the field inquiry. That version of events establishes a "classification [that] is as explicit as if promulgated by the legislature." Carl J. Schifferle, Comment, *After Whren v. United States: Applying the Equal Protection Clause to Racially Discriminatory Enforcement of the Law,* 2 *Mich. L. & Pol'y Rev.* 159, 168 (1997); *accord* Sheri Lynn Johnson, *Race and the Decision to Detain a Suspect,* 93 *Yale L.J.* 214, 241 (1983).

 Because an inference of selective law enforcement was raised, and because there were three disparate and inconsistent versions of defendant's encounter with the police, the State was required to have established a non-discriminatory basis for the officers to conduct a field inquiry. The paper-bag version of events is the only possible basis, on this record, that could rebut the selective enforcement inference. Yet, that version appears to be based only on a hunch that defendant was carrying contraband in the paper bag. We do not intend to suggest that ordinarily a proper field inquiry could not be based on a hunch. But that rationale will not do here. Because the totality of the record suggests that the hunch itself was, in our view, at least in part based on racial stereotyping, it was insufficient to rebut the inference of selective law enforcement that tainted the police conduct. The officers' field inquiry is therefore defective.

## C.

 This record is also deficient to support an investigatory stop. An "investigatory stop" permits law enforcement officers to detain an individual temporarily for questioning. *Terry, supra,* 392 *U.S.* at 22, 88 *S.Ct.* at 1880, 20 *L.Ed.*2d at 906; *Davis, supra,* 104 *N.J.* at 504, 517 *A.*2d 859. In contrast to a field inquiry, an investigatory stop directly implicates the Fourth Amendment because it involves a seizure in the constitutional sense. Because the seizure is temporary and minimally intrusive, however, the Fourth

Amendment's warrant and probable cause requirements are relaxed. Instead, a police officer may conduct an investigatory stop if, based on the totality of the circumstances, there is a reasonable and particularized suspicion to believe that an individual has just engaged in, or is about to engage in, criminal activity. *Terry, supra*, 392 *U.S.* at 21, 88 *S.Ct.* at 1880, 20 *L.Ed.*2d at 906; *State v. Arthur*, 149 *N.J.* 1, 8, 691 *A.*2d 808 (1997); *Davis, supra*, 104 *N.J.* at 504, 517 *A.*2d 859.

As we further explained in *Arthur, supra*, 149 *N.J.* at 7–8, 691 *A.*2d 808:

> The standards by which the reasonableness of police conduct involving an investigatory stop of a person or an automobile originate with *Terry v. Ohio*, 392 *U.S.* 1, 88 *S.Ct.* 1868, 20 *L.Ed.*2d 889 (1968). In *Terry*, the United States Supreme Court recognized that the Fourth Amendment's protection against unreasonable search and seizure limited law enforcement's ability to conduct investigatory stops and protective searches of persons suspected of criminal activity. The Supreme Court stated that the reasonableness of the police conduct in conducting an investigatory stop in light of the Fourth Amendment could be generally assessed by " 'balancing the need to search (or seize) against the invasion which the search (or seizure) entails.' " *Id.* at 21, 88 *S.Ct.* at 1879, 20 *L.Ed.*2d at 905 (quoting *Camara v. Municipal Court*, 387 *U.S.* 523, 536–37, 87 *S.Ct.* 1727, 1735, 18 *L.Ed.*2d 930, 940 (1967)). The facts used in that balancing test are to be judged objectively: "would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?" *Id.* at 21–22, 88 *S.Ct.* at 1880, 20 *L.Ed.*2d at 906 (internal quotations omitted). When determining if the officer's actions were reasonable, consideration must be given "to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Id.* at 27, 88 *S.Ct.* at 1883, 20 *L.Ed.*2d at 909. Neither "inarticulate hunches" nor an arresting officer's subjective good faith can justify an infringement of a citizen's constitutionally guaranteed rights. *Id.* at 21, 88 *S.Ct.* at 1880, 20 *L.Ed.*2d at 906. Rather, the officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion."
>
> [*Ibid.*]

Based on those principles, we concluded in *Arthur* that the police had sufficient articulable suspicion to support an investigatory stop of the driver of a vehicle in the following circumstances: the vehicle, with the defendant sitting in the driver's seat, was parked in a known area of high drug traffic that the police had under surveillance; the police observed a person entering the vehicle on the passenger side and sitting for a few minutes next to

the defendant; and the police then observed that person leaving the vehicle carrying a paper bag. Based on their training and experience they believed that they had witnessed a narcotics transaction. We were satisfied that, in view of the totality of circumstances, their belief was more than a mere hunch and rose to the level of reasonable and articulable suspicion.

That is not, however, the case here. The transit officers here were not on narcotics-surveillance duty but rather graffiti patrol. There is nothing in the record to suggest that they had any reason to suspect that narcotics were being carried through the Rahway train station. They observed nothing suggesting that a drug transaction had taken place. All they did observe, if the "paper bag" version is believed, was defendant getting off the train carrying a paper bag, which he placed in the waistband of his sweat pants which may or may not have had pockets. They described that simple act as "unusual," leaping immediately to the conclusion that the paper bag might have contained drugs or a weapon. But they did not explain why the act was unusual, or suggest that as a matter of their experience and training, either drugs or weapons are typically or frequently transported in that manner, or offer any other circumstance whatsoever that could have justified their hunch that that was indeed the case here.

As Judge Kestin observed in his dissenting opinion below, "I know of no reason why any person stepping from a train onto a station platform should apprehend a police response of any kind if he or she decides to place any object not apparently contraband out of sight on his or her person upon emerging." *Maryland, supra,* 327 *N.J.Super.* at 456, 743 *A.2d* 876 (Kestin, J.A.D., dissenting). Absent any circumstance of record permitting the reasonable suspicion that the object is likely to be contraband, we agree. Indeed, there is a complete absence from this record of any other circumstance, either in fact, or based on the officers' testimony respecting their training and experience, that could justifiably have transformed their hunch into a reasonable and articulable suspicion.

In sum, on a motion to suppress evidence resulting from a warrantless search, the State has the burden of proving the validity of the search. *See, e.g., State v. Valencia,* 93 *N.J.* 126, 133, 459 *A.*2d 1149 (1983). If the initial approach is deemed to have been a field inquiry, the State failed to overcome the inference engendered by its own proofs that this was a proscribed race-based field inquiry. If the initial approach or its later escalation is deemed an investigatory stop because defendant perceived that he was detained and not free to go, the State failed to prove a reasonable and articulable suspicion justifying the stop. Finally, it is clear that a proper field inquiry or constitutionally permissible investigatory stop may escalate into a situation justifying a *Terry* protective search if the suspect is reasonably suspected of being armed and dangerous. *State v. Smith,* 155 *N.J.* 83, 91, 713 *A.*2d 1033, *cert. denied,* 525 *U.S.* 1033, 119 *S.Ct.* 576, 142 *L.Ed.*2d 480 (1998). The *Terry* search here could have been valid, however, only if it occurred during a proper field inquiry or investigatory stop. If the field inquiry or investigatory stop was defective, then the "seizure" must be deemed constitutionally defective and the drugs seized must be regarded as the "fruit of the poisonous tree" and the evidence suppressed. *Costello v. United States,* 365 *U.S.* 265, 280, 81 *S.Ct.* 534, 542, 5 *L.Ed.*2d 551, 561 (1961); *Smith, supra,* 155 *N.J.* at 102, 713 *A.*2d 1033. Because the State failed to prove either a valid investigatory stop or a permissible field inquiry, the *Terry* search must fall as well.

### III.

The judgment of the Appellate Division affirming the order of the Law Division is reversed. We remand to the Law Division for entry of an order granting defendant's motion to suppress.

*For reversal and remandment*—Chief Justice PORITZ and Justices STEIN, COLEMAN, ZAZZALI and PRESSLER (temporarily assigned)—5.

*Opposed*—None.