796 A.2d 857

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
RAUL RODRIGUEZ, DEFENDANT–APPELLANT.

Argued February 26, 2002—Decided May 15, 2002.

118

*Mary Virginia Barta,* Assistant Deputy Public Defender, argued the cause for appellant (*Peter A. Garcia,* Acting Public Defender, attorney).

*Jack R. Martin,* Assistant Prosecutor, argued the cause for respondent (*Jeffrey S. Blitz,* Atlantic County Prosecutor, attorney).

*Michael J. Williams,* Deputy Attorney General, argued the cause for amicus curiae, Attorney General of New Jersey (*Peter C. Harvey,* Acting Attorney General, attorney).

The opinion of the Court was delivered by

VERNIERO, J.

This case implicates defendant's right to be free of unreasonable searches and seizures under the Fourth Amendment of the United States Constitution and under the analogous provision of our State Constitution. We must determine whether the police subjected defendant to an investigative detention prior to their search of his person and, if so, whether they had a sufficient basis to justify that conduct. The lower courts found no constitutional violation. We hold that defendant was the subject of an investigative detention and, further, that the totality of circumstances did not justify it.

I.

These are the relevant facts, derived largely from a suppression hearing conducted by the trial court. On July 14, 1998, New Jersey Transit Police Officer Eugene Oberfrank and a fellow officer, Sergeant Kevin Amberg, were patrolling the bus terminal in Atlantic City. At about 2:15 p.m., Officer Oberfrank received a telephone call from an unknown male. The caller informed the officer that two men had left Ocean City to go to Philadelphia to purchase narcotics and that they would be returning that same day via Atlantic City.

The caller described one man as a thin, Hispanic male, about five feet, ten inches tall, wearing white shorts, a white tee shirt,

and gold-rimmed glasses. The caller described the second man as a white, heavyset male, six feet tall, with a receding hairline and mustache, wearing a black tank top and dark shorts.

The anonymous caller also said that the men were traveling by bus. Although he did not provide a time that the two men would pass through Atlantic City, the informant did indicate the time that they had left Ocean City. Based on that information, Officer Oberfrank estimated that the men would arrive in Atlantic City sometime between 3:30 and 5:00 o'clock that afternoon. The officer testified that the informant "didn't want to tell me his name."

After receiving the call, Officer Oberfrank related the information to his supervisor, Sergeant Amberg. Starting at about 3:30 p.m., the officers began surveillance of all buses arriving in Atlantic City from Philadelphia. At about 4:45 p.m., Officer Oberfrank saw two men, who fit the description furnished by the informant, exit a bus. As the two men walked by the officers, Officer Oberfrank pointed them out to the sergeant. The two men from the bus proceeded to a public telephone.

According to the officers, one of the men, later identified as defendant, appeared to be Hispanic and wearing a white tee shirt, white shorts, and gold-rimmed glasses. They stated that defendant was carrying a blue bag with "Gap" printed on it. The officers indicated that the other man, later identified as Joseph Forte, appeared to be a white, heavyset male, wearing a black tank top and dark shorts, and appeared to have a receding hairline and mustache. The officers stated that they noticed nothing unusual about either man's demeanor.

Officer Oberfrank testified that as one of the men began making a call, the officers asked both men if they would agree to speak with them. The men answered "yes," and they agreed also to accompany the officers back to the terminal's patrol office. Sergeant Amberg did not recall precisely what his fellow officer had stated, "because up until that point, basically, [Officer Oberfrank] was doing all the talking." The sergeant stated that "we asked

[both men] if they would come to the office. We did not tell them that they had to come to the office."

Dressed in police uniforms, both officers carried weapons, handcuffs, mace, and radios at the time of the encounter. The officers asked no questions of defendant and Forte as they walked to the patrol office, approximately thirty feet from the public telephone. The record reveals that the outer door to the patrol office at the Atlantic City bus terminal locks automatically once a person is inside, and can be opened only with a swipe card or a key.

Once inside the patrol office the police separated the two men, placing defendant in the main processing room and positioning Forte in an adjoining room. The door between the two rooms was left ajar. Officer Oberfrank stated that one of the reasons for that separation was to prevent either man from hearing what the other was saying. Officer Oberfrank "bounced back and forth," but stayed generally with Forte, whereas Sergeant Amberg stayed with defendant. The officers asked defendant and Forte "if they had anything on them they shouldn't have," and both replied, "no." The police also asked them for identification, and eventually learned their names.

Sergeant Amberg stated that he asked defendant and Forte independently if they would consent to a search of their persons. He informed them that they had a right to refuse consent, and he gave them each a consent form to sign. Officer Oberfrank testified that the sergeant read the consent to search form to defendant. The sergeant testified that he did not read the form word for word, but rather summarized it. Officer Oberfrank indicated that this was his first experience with a situation involving a consent to search.

Officer Oberfrank also testified that, in addition to serving as an officer for New Jersey Transit, he had been trained to recognize symptoms of drug withdrawal as an emergency medical technician. The officer stated that defendant did not exhibit any symptoms of drug withdrawal and that defendant never complained of being ill or under the influence of drugs.

Defendant signed the consent to search form at 4:55 p.m., approximately ten minutes after the police saw him exit the bus. Significantly, Sergeant Amberg stated that he posed no questions to defendant or Forte from the time that he had approached them at the public telephone to the time that he had asked defendant to sign the form at the patrol office. The sergeant further indicated that he had not received any additional information to corroborate the original tip.

After defendant signed the form, the officers searched his person and bag. The police found one blue packet of what proved to be heroin in defendant's left sock, one packet of heroin in the coin pocket of his shorts, fifty-nine packets of heroin in the Gap bag (along with two empty packets), a hypodermic syringe, and over $630 in cash. They arrested defendant at approximately 5:10 p.m. and informed him of his constitutional rights as required by *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L. Ed.*2d 694 (1966). The arrest occurred approximately twenty-five minutes after defendant had left the bus.

The police also searched Forte, who had been asked to sign a consent to search form, but they found no contraband as a result of that search. Nonetheless, the police arrested Forte as well after consulting with the Atlantic County Prosecutor's Office.

Defendant and Forte were indicted for possession of a controlled dangerous substance, in violation of *N.J.S.A.* 2C:35–10a(1) (count one); possession of a controlled dangerous substance with intent to distribute, in violation of *N.J.S.A.* 2C:35–5a(1), 5b(3) (count two); and possession of a controlled dangerous substance with intent to distribute within 1000 feet of a school, in violation of *N.J.S.A.* 2C:35–7 (count three).

Defendant moved before the trial court to suppress the fruits of the search. The trial court denied that motion. Defendant then pled guilty to count three of the indictment. In the course of entering into the plea arrangement, defendant exonerated Forte, causing all charges against Forte to be dismissed. The trial court

sentenced defendant to an extended term of six years with three years of parole ineligibility.

In a reported decision, the Appellate Division affirmed. *State v. Rodriguez*, 336 *N.J.Super.* 550, 555, 765 *A.*2d 770 (2001). The panel determined that the officers had engaged in nothing more than a field inquiry, which requires no suspicion of criminal activity to justify. *Id.* at 560, 765 *A.*2d 770. In the alternative, the court concluded that if the inquiry had escalated into an investigative stop, the anonymous informant had provided enough information to the police to sustain defendant's detention under the applicable case law. *Id.* at 564, 765 *A.*2d 770. As for the search itself, the court agreed with the State that defendant was aware of his right to withhold consent, and that defendant had waived that right knowingly. *Id.* at 561–62, 765 *A.*2d 770. The court, therefore, affirmed the trial court's denial of defendant's suppression motion. *Id.* at 566, 765 *A.*2d 770.

We granted defendant's petition for certification, 170 *N.J.* 84, 784 *A.*2d 717 (2001), and granted *amicus curiae* status to the Attorney General. We now reverse.

## II.

The starting point of our analysis is the Fourth Amendment of the United States Constitution and its analogue, Article I, paragraph 7 of the New Jersey Constitution. See *U.S. Const.* amend. IV; *N.J. Const.* art. I, ¶ 7. "Those similarly worded provisions protect citizens against unreasonable police searches and seizures by requiring warrants issued upon probable cause 'unless [the search] falls within one of the few well-delinated exceptions to the warrant requirement.'" *State v. Maryland,* 167 *N.J.* 471, 482, 771 *A.*2d 1220 (2001) (alteration in original) (citations omitted).

## A.

Not all police-citizen encounters constitute searches or seizures for purposes of the warrant requirement. *Id.* at 483, 771

*A*.2d 1220. One such encounter, a field inquiry, is a limited form of police investigation that, except for impermissible reasons such as race, may be conducted "without grounds for suspicion." *Ibid.* (citation and quotation omitted). In general terms, a police officer properly initiates a field inquiry by approaching an individual on the street, or in another public place, and " 'by asking him if he is willing to answer some questions[.]' " *State v. Davis*, 104 *N.J.* 490, 497, 517 *A*.2d 859 (1986) (citations omitted).

A field inquiry is not considered a seizure "in the constitutional sense so long as the officer does not deny the individual the right to move." *State v. Sheffield*, 62 *N.J.* 441, 447, 303 *A*.2d 68 (1973). The officer's demeanor is relevant to the analysis. *Davis, supra*, 104 *N.J.* at 497, 517 *A*.2d 859. For example, "an officer would not be deemed to have seized another if his questions were put in a conversational manner, if he did not make demands or issue orders, and if his questions were not overbearing or harassing in nature." *Id.* at 497 n. 6, 517 *A*.2d 859 (citing Lafave, 3 *Search and Seizure*, § 9.2 at 53–54 (1978)). Neither the officer's subjective intent, *Maryland, supra*, 167 *N.J.* at 483, 771 *A*.2d 1220, nor the subjective belief of the citizen, *State v. Tucker*, 136 *N.J.* 158, 165–66, 642 *A*.2d 401 (1994), determines whether a seizure has occurred. An encounter becomes more than a mere field inquiry when an objectively reasonable person feels that his or her right to move has been restricted. *Davis, supra*, 104 *N.J.* at 498, 517 *A*.2d 859.

B.

An investigatory stop (sometimes called a *Terry* stop or investigative detention) is considered more intrusive than a field inquiry and, therefore, a different analysis applies when evaluating that form of police conduct. *Maryland, supra*, 167 *N.J.* at 486, 771 *A*.2d 1220. An officer does not need a warrant to make such a stop if it is based on "specific and articulable facts which, taken together with rational inferences from those facts," give rise to a reasonable suspicion of criminal activity. *Terry v. Ohio*, 392 *U.S.*

1, 21, 88 *S.Ct.* 1868, 1880, 20 *L.Ed.*2d 889, 906 (1968). The "[r]easonable suspicion necessary to justify an investigatory stop is a lower standard than the probable cause necessary to sustain an arrest." *State v. Stovall,* 170 *N.J.* 346, 356, 788 *A.*2d 746 (2002).

In determining the lawfulness of an investigative stop, we have explained:

> An investigatory stop is valid only if the officer has a "particularized suspicion" based upon an objective observation that the person stopped has been or is about to engage in criminal wrongdoing. The "articulable reasons" or "particularized suspicion" of criminal activity must be based upon the law enforcement officer's assessment of the totality of circumstances with which he is faced. Such observations are those that, in view of [the] officer's experience and knowledge, taken together with rational inferences drawn from those facts, reasonabl[y] warrant the limited intrusion upon the individual's freedom.
>
> [*Davis, supra,* 104 *N.J.* at 504, 517 *A.*2d 859.]

An anonymous tip, standing alone, is rarely sufficient to establish a reasonable articulable suspicion of criminal activity. *Alabama v. White,* 496 *U.S.* 325, 329, 110 *S.Ct.* 2412, 2415, 110 *L.Ed.*2d 301, 308 (1990). The United States Supreme Court has warned that "the veracity of persons supplying anonymous tips is 'by hypothesis largely unknown, and unknowable.'" *Ibid.* (quoting *Illinois v. Gates,* 462 *U.S.* 213, 237, 103 *S.Ct.* 2317, 2332, 76 *L. Ed.*2d 527, 548 (1983)). That Court also has instructed that an informant's "veracity," "reliability," and "basis of knowledge" are "relevant in determining the value of his report." *Id.* at 328, 110 *S.Ct.* at 2415, 110 *L.Ed.*2d at 308 (citation and quotation marks omitted). To justify action based on an anonymous tip, the police in the typical case must verify that the tip is reliable by some independent corroborative effort. *Id.* at 329–30, 110 *S.Ct.* at 2415–16, 110 *L.Ed.*2d at 309.

Generally, "if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." *Id.* at 330, 110 *S.Ct.* at 2416, 110 *L.Ed.*2d at 309. Stated differently, courts have found no constitutional violation when there has been "independent corroboration by the police of

significant aspects of the informer's predictions[.]" *Id.* at 332, 110 *S.Ct.* at 2417, 110 *L.Ed.*2d at 310. The analysis in any given case turns ultimately on the totality of the circumstances. *Id.* at 330, 110 *S.Ct.* at 2416, 110 *L.Ed.*2d at 309.

## III.

### A.

In applying the above tenets, our first task is to determine whether the police inquiry of defendant escalated into an investigative detention. As noted, that question turns on the tenor of the officer's actions and whether an objectively reasonable person in defendant's position would have felt free to exit the encounter.

We agree with defendant that he was the subject of an investigative detention based on the following facts. Once inside the patrol office, the police separated defendant from Forte, and after that separation, an officer questioned defendant in a manner that presupposed criminal activity. For the bulk of the encounter, defendant was isolated from his traveling partner and was asked questions in a closed-door, police-dominated atmosphere. We conclude that an objectively reasonable person in defendant's position would not have felt free to leave the patrol office under those circumstances.

Urging a contrary conclusion, the State argues that it was safer for the officers and less embarrassing to defendant to question him in the patrol office. Moreover, the State emphasizes that the police informed defendant that he was free to leave and was under no obligation to speak with them. Succinctly stated, the State contends that no reasonable person under those circumstances would have considered the encounter to be an investigative detention within the constitutional meaning of those terms.

We disagree. The record contains no basis to conclude that a concern for officer safety justified the movement of defendant from the street to the patrol office. That the police may have intended to spare defendant the embarrassment of being ques-

tioned on the street, although laudable, is equally unavailing. We have recognized previously that an officer's subjective good faith cannot "justify an infringement of a citizen's constitutionally guaranteed rights." *State v. Arthur*, 149 *N.J.* 1, 8, 691 *A.*2d 808 (1997).

We also have recognized that, as a practical matter, citizens almost never feel free to end an encounter initiated by the police. *State v. Valentin*, 105 *N.J.* 14, 19, 519 *A.*2d 322 (1987). That reality is buttressed when the encounter itself takes place in a closed-door patrol office. We remain unconvinced that "defendant, under all of the attendant circumstances, reasonably believed he could walk away without answering any of [the officers'] questions." *Maryland, supra,* 167 *N.J.* at 483, 771 *A.*2d 1220.

Finally, the tenor of the police questions, namely, whether defendant and Forte "had anything on them that they shouldn't have," contributes to our finding that defendant's encounter with the police had moved beyond a mere field inquiry. Although other courts have found similar questions by the police, standing alone, to be dispositive, we need not make that finding here in view of the other facts noted above. See *State ex rel. J.G.*, 320 *N.J.Super.* 21, 30–31, 726 *A.*2d 948 (App.Div.1999) (concluding that asking defendant whether "there was 'anything on him that [he] shouldn't have,' " moved encounter from field inquiry to investigative detention); *cf. State v. Contreras*, 326 *N.J.Super.* 528, 534, 540, 742 *A.*2d 154 (App.Div.1999) (concluding that asking defendant "if he had anything of that type [drugs or weapons] on his person" turned field inquiry into *Terry* stop).

## B.

Having concluded that the field inquiry of defendant escalated into an investigative detention, we next consider whether the police had a reasonable articulable suspicion of criminal wrongdoing to justify that action. Because the police asked no questions of defendant before taking him to the patrol office and observed nothing unusual about him, the information obtained from the anonymous informant constitutes the only possible basis on which

to justify the stop. In that respect, our analysis is informed by the Supreme Court's recent decision in *Florida v. J.L.*, 529 *U.S.* 266, 120 *S.Ct.* 1375, 146 *L.Ed.*2d 254 (2000).

In *J.L.*, an anonymous caller reported to the police that a young black male was standing at a particular bus stop, wearing a plaid shirt, and carrying a gun. *Id.* at 268, 120 *S.Ct.* at 1377, 146 *L.Ed.*2d at 258-59. The police did not record the call and knew nothing about the informant. The police responded to the scene and observed three black males "just hanging out" at the bus stop. One of the males, the defendant, was wearing a plaid shirt. *Ibid.* The officers observed no unusual movements or threatening conduct on anyone's part. Nonetheless, based on the tipster's information, one of the officers approached the defendant, frisked him, and seized a gun from his pocket. *Ibid.* A second officer frisked the other two men, "against whom no allegations had been made, and found nothing." *Ibid.*

The Court held that the information furnished by the informant was insufficient to justify the frisk of the defendant under the *Terry* standard. Writing for a unanimous Court, Justice Ginsburg explained:

> The anonymous call concerning [the defendant] provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility. That the allegation about the gun turned out to be correct does not suggest that the officers, prior to the frisks, had a reasonable basis for suspecting [the defendant] of engaging in unlawful conduct: The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search. All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about [the defendant].

> [*Id.* at 271, 120 *S.Ct.* at 1379, 146 *L.Ed.*2d at 260-61.]

In addressing the government's contention that the tip was reliable because it accurately described the defendant's physical attributes, Justice Ginsburg stated:

> An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable

suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.

[*Id.* at 272, 120 *S.Ct.* at 1379, 146 *L.Ed.*2d at 261.]

 We conclude similarly in this case. The informant accurately described the appearance of defendant and Forte, and correctly predicted their location at the bus terminal. We cannot reasonably conclude, based on those benign elements of the informant's tip, that the tip itself was "reliable in its assertion of illegality[.]" *Ibid.* In respect of that aspect of the tip most critical to the analysis, namely, that defendant would be engaged in drug trafficking, the informant provided no explanation of how or why he arrived at that conclusion. In fact, the only portion of the tip corroborated by the officers pertained to the innocent details of defendant's appearance at the bus terminal. Without more, the tip is insufficient to justify the detention under *Terry* and our analogous case law.

In arguing for a contrary disposition, the Attorney General, as *amicus,* cites this Court's recent decision in *Stovall, supra,* 170 *N.J.* 346, 788 *A.*2d 746. In *Stovall,* a detective in New Jersey received a tip from a fellow law enforcement officer in California based on information that the fellow officer had obtained from an airline employee at Los Angeles International Airport. *Id.* at 351–52, 788 *A.*2d 746. The employee believed that two women had checked into the airport using questionable identification. *Id.* at 352, 788 *A.*2d 746. The travelers also had purchased "bulk" tickets from a travel agency that purportedly had sold tickets to other drug traffickers. *Id.* at 352–53, 788 *A.*2d 746. Based on that information, the California officer suspected that the two individuals were engaged in drug trafficking, and he relayed that belief, in addition to the relevant flight information, to his fellow officer in New Jersey. *Id.* at 352, 788 *A.*2d 746. The tip contained a detailed description of the two women and their luggage. *Ibid.*

In Newark, the detective and his partner who had received the tip noticed the two women as they arrived from the identified flight. *Ibid.* One of the officers believed that the defendant's

identification was questionable because it consisted of an expired card listing an address on "Main Street" in Los Angeles. *Id.* at 353, 788 *A.*2d 746. Defendant also appeared visibly nervous as she spoke to the officers prior to their search of her luggage. *Id.* at 354, 788 *A.*2d 746. Emphasizing those facts, in addition to the "extensive experience and expertise" of the officers, the Court sustained the detention of the defendant under the *Terry* standard. *Id.* at 370–71, 788 *A.*2d 746.

In contrast, the officers in this case testified that defendant did not exhibit any unusual demeanor. Another difference is that the officers involved in *Stovall* had extensive experience in drug enforcement, whereas Officer Oberfrank testified that this was the first time that he had experienced a situation involving a consent to search. Most importantly, the officer in *Stovall* asked questions of the suspect to corroborate some of the information provided in the tip, and the tip itself was not anonymous. In this case, the informant never revealed his identity or the basis of his knowledge, and the officers did not corroborate the information other than to observe defendant's appearance at the bus terminal. *Stovall* clearly is inapposite.

## C.

In view of our conclusion that the officers lacked a sufficient basis to detain defendant, we need not evaluate whether his consent to the search was voluntary. The illegal detention voids the consent. *Wong Sun v. United States,* 371 *U.S.* 471, 485, 83 *S.Ct.* 407, 416, 9 *L.Ed.*2d 441, 453–54 (1963); *State v. Costa,* 327 *N.J.Super.* 22, 32, 742 *A.*2d 599 (App.Div.1999). Accordingly, *no* further analysis is required.

## IV.

In sum, because the field inquiry of defendant escalated into an investigative detention, the police were required to form a reasonable articulable suspicion of criminal activity to justify the stop. The suspicion here was based solely on information furnished by

an anonymous informant who provided no explanation or basis of knowledge for that information. The police officers' observation of defendant's innocent arrival at the bus terminal was insufficient to verify the reliability of the tip. Without greater justification, the stop cannot be sustained under *Terry* or under our analogous State jurisprudence. Lastly, the stop's illegality voids defendant's subsequent consent to search and, as a result, the fruits of the warrantless search must be suppressed.

## V.

The judgment of the Appellate Division is reversed, and the matter is remanded to the Law Division for further proceedings consistent with this opinion.

*For reversal*—Chief Justice PORITZ, and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA, and ZAZZALI—7.

*Opposed*—None.