**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3627-16T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JEFFREY P. THOMAS, a/k/a RAY
FREDDIE and THOMAS P. JEFFERY,

    Defendant-Appellant.

_____

Submitted March 7, 2018 — Decided July 24, 2018

Before Judges Alvarez and Nugent.

On appeal from Superior Court of New Jersey,
Law Division, Mercer County, Indictment No.
15-12-1374.

Joseph E. Krakora, Public Defender, attorney
for appellant (Daniel V. Gautieri, Assistant
Deputy Public Defender, of counsel and on the
brief).

Gurbir S. Grewal, Attorney General, attorney
for respondent (Sarah E. Ross, Deputy Attorney
General, of counsel and on the brief).

PER CURIAM

    Defendant, Jeffrey P. Thomas, lost his motion to suppress a

handgun and heroin police had seized from him during a street

encounter. He later pled guilty to second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b). For that crime, a judge sentenced him to serve a five-year prison term with three and one-half years of parole ineligibility. Defendant appeals. He argues:

POINT I

THE COURT ERRED IN DENYING THE MOTION TO SUPPRESS BECAUSE THE TIP FROM THE CONFIDENTIAL INFORMANT THAT PROMPTED THE INVESTIGATORY STOP CONSISTED ALMOST ENTIRELY OF INNOCENT IDENTIFYING DETAILS AND THE POLICE FAILED TO CORROBORATE THE NOTION THAT THOMAS WAS ENGAGED IN CRIMINAL ACTIVITY BEFORE STOPPING HIM.

POINT II

THE COURT ERRED IN FAILING TO AWARD GAP-TIME CREDIT FOR TIME THE DEFENDANT SERVED ON A MUNICIPAL SENTENCE. (Not Raised Below).

We affirm the conviction and sentence but remand for the trial court to compute gap time credits.

A Mercer County grand jury charged defendant in a five-count indictment with second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b), third-degree possession of a controlled dangerous substance, N.J.S.A. 2C:35-10(a)(1), fourth-degree obstructing administration of law, N.J.S.A. 2C:29-1(b), third-degree escape, N.J.S.A. 2C:29-5(a), and third-degree resisting arrest, N.J.S.A. 2C:29-2(a)(3)(a). Following the indictment, defendant filed a suppression motion. The trial court denied it.

Defendant later pled guilty to the weapons offense, the trial court sentenced him, and he appealed.

The sole witness at the suppression hearing was Detective Sergeant Ricardo Diaz, an eleven-year veteran with the New Jersey State Police. He testified as follows. On May 14, 2015, he was assigned to the Trenton Crime Suppression Central Unit, which was established to "help suppress violent crimes in the most problematic areas in the City of Trenton." Shortly before 8:00 p.m., the unit received a telephone call from a confidential source who stated "a black male in the area of New Willow Street and Beakes Street in Trenton [was] in possession of a handgun." Detective Diaz did not speak with the informant. The informant spoke to the detective's partner, Detective Blair Astbury, and Astbury told Diaz what the informant said.

Astbury told Diaz the informant had previously provided information resulting in approximately six or more arrests and "at least one or more" convictions. Diaz acknowledged the informant received either credit against a sentence or money for providing the police with information.

The informant told Detective Astbury the person in possession of the handgun was "an older black male approximately [fifty] years old, approximately six feet tall with gray hair." The suspect "was wearing a red collared shirt, black shorts, white

sneakers, and also had an Ace tan bandage wrapped around his right wrist and arm." The informant said the male was "in the company of an older black female wearing a black shirt and blue jeans."

Detective Diaz gave conflicting answers when cross-examined about whether the informant explained how he knew the person had a handgun. In response to defense counsel's question, "[n]ow, when you received that information . . . were you provided with any information as to how he knew that the individual had a handgun," the detective replied, "[n]o ma'am." Counsel persisted: "He didn't say that he had observed him with it, nothing whatsoever as to how he knew?" Detective Diaz responded, "I believe the confidential source observed [defendant] in possession of the handgun, which is when . . . he or she called Detective Astbury." Pressed further by defense counsel, Detective Diaz said the confidential source contacted Detective Astbury and stated that he or she observed defendant in possession of a handgun. According to Diaz, that was what Detective Astbury told him.

Detective Diaz and seven other unit members donned tactical vests — bullet proof vests placed on the outside of one's clothing and containing police identifiers — and drove unmarked vehicles to the corner of New Willow Street and Beakes Street. The officers parked the vehicles along the curb line of either Beakes Street or Willow Street, or perhaps both. The intersection was located

4                                                              A-3627-16T1

in a high crime area. Nearby was a housing project where police had made numerous arrests for controlled dangerous substance offenses and gun possessions. There had also been documented shootings and homicides in that area.

Upon arriving, Detective Diaz observed defendant, who matched the description given by the confidential source. Defendant was walking with a black female. Detective Diaz and three other officers made the initial "approach" toward defendant. Detective Diaz was closest to defendant, but the other three officers were behind the detective. When Detective Diaz first started speaking with defendant, the other detectives were standing either to his left or to his right. They were close enough to reach defendant if he attempted to flee. Defendant stopped, Detective Diaz identified himself as "State Police," and the two men engaged in a conversation.

Detective Diaz began what he characterized as "a field inquiry." His intention was to talk to defendant and ask him routine questions, such as his name, where he was from, and questions of that nature. Detective Diaz estimated he and defendant were approximately five to ten feet apart. Defendant appeared to be intoxicated or perhaps under the influence of some type of controlled dangerous substance. Defendant smelled of

alcohol, his clothes were soiled, and his eyes were bloodshot and watery.

As they spoke, defendant "began to blade . . . the right side of his body from [the officer]." By "blade," the detective meant that when he first approached defendant, he could see both defendant's hands and his whole body. As the two men began to speak, however, defendant "began turning his body, blading himself where [the detective] couldn't see [the defendant's] right shoulder, his right shoulder all the way down." The detective could only see the left side of defendant's body.

Defendant "bladed" away from the detective twice. Detective Diaz testified: "The first time when he bladed away from me and attempted to put his right hand in his pocket I asked him to stop immediately, and I wanted to see both his hands. And for officer safety I said, put your hands on top of your head." Defendant "did comply and put both his hands on his head for a couple seconds, and then immediately dropped his hands again, and attempted to place it in his right pocket again."

Concerned defendant had a gun, the detective frisked him for weapons. Detective Diaz felt the barrel of a weapon in defendant's right pants pocket. The detective retrieved a silver Derringer.

Asked why he felt the need to frisk defendant for his safety, Detective Diaz replied:

A-3627-16T1

> Based on the description given by the confidential source, [defendant] matched all the identifiers the source gave us, where we were, it's a high crime area. The fact that the confidential source said that he was in possession of a handgun, the way he was blading his body away from me and attempting to put his right hand in his pocket, at that time I felt threatened as if he may have had a weapon on him.

Asked if defendant was free to leave after the conversation commenced, Detective Diaz replied:

> I would say based on how the conversation was going he could have been free to leave if what happened - - if what I didn't see, and if he didn't blade his body in that manner. Like I said, just the totality of the circumstances. I just - - if the conversation would have been different, if he didn't do some of the things he did, he probably would have been free to go. Because I approached him like I would approach anyone else.

After seizing the Derringer, Detective Diaz placed defendant under arrest, handcuffed him, and searched him incident to the arrest. The detective found two bags of heroin and a glass smoking pipe in defendant's other pocket.

Based on Detective Diaz's testimony, the trial court denied defendant's suppression motion. The court found Detective Diaz to be "a highly credible witness who testified in a persuasive manner."

After recounting the confidential source's description of the suspect and his companion, the court noted: "Det. Sgt. Diaz

7

conceded that the [confidential source] did not provide a name for the individual whom he said had the gun, nor did he explain how or why he knew this individual had a gun." Nonetheless, the court determined the police had reasonable suspicion to conduct an investigative detention. The court relied upon "[Detective Diaz's] experience and expertise in evaluating the veracity and reliability of the [confidential source's] information" as well as what the court concluded was "sufficient corroboration" of the informant's tip, "particularly in light of the totality of the circumstances." The court explained:

> That evening, a reliable informant, whose previous information had led to "at least six" prior arrests, relayed information to Det. Astbury that an older black male in a certain location was in possession of a gun. Because the source of the information was a known informant — compared to an anonymous 9-1-1 caller, for example — his "reputation [could] be assessed and [he could] be held responsible if [his] allegations" of criminal activity turned out "to be fabricated." FL v. J.L., 529 U.S. [266,] 270 [(2000)]. The court finds that under these circumstances, there seemed [to be] no incentive for the [confidential source] to lie about the defendant's alleged criminal activity. Additionally, the veracity of the [confidential source's] tip can be established by the [confidential source's] past reliability. State v. Keyes, 184 N.J. 541, 555 (2005). This [confidential source] had previously provided reliable information which had led to arrests; the officers could not let a credible tip about a weapon go uninvestigated.

Although not relevant to this appeal, the trial court also determined Detective Diaz lawfully seized the heroin and pipe from defendant's person during the search incident to defendant's arrest.

On appeal, defendant argues that his street encounter with police, from its inception, was an investigatory stop unsupported by a reasonable and articulable suspicion defendant had or was about to engage in criminal activity. Defendant contends the State failed to establish the reliability of the informant's tip because Detective Diaz had no personal knowledge of the informant's previous involvement with police, and the State produced no evidence as to how the informant acquired knowledge that defendant possessed a gun.

The State contends the street encounter began as a field inquiry and escalated into an investigative detention only after defendant "bladed" the right side of his body, reached toward his pocket, and refused to keep his hands visible. The State argues these circumstances, considered in the setting of a high crime area and in light of the confidential informant's tip, provided a reasonable and articulable suspicion to support Detective Diaz's pat down of defendant for a weapon.

When reviewing a trial court's order granting or denying a defendant's suppression motion, "an appellate tribunal must defer

to the factual findings of the trial court when that court has made its findings based on the testimonial and documentary evidence presented at an evidentiary hearing or trial." State v. Hubbard, 222 N.J. 249, 269 (2015). Likewise, an appellate court generally must defer to a trial court's credibility findings. Ibid. The reason for the deference is that factual findings and credibility determinations "are substantially influenced by [an] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." Id. at 262 (alteration in original) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). An appellate court owes no special deference, however, to either a trial court's legal conclusions or "the consequences that flow from established facts." Id. at 263 (citing State v. Gandhi, 201 N.J. 161, 176 (2010)).

The warrantless search here took place during a street encounter between police and defendant. Warrantless searches and seizures presumably violate the constitutional "right of the people to be secure in their persons, houses, papers, and effects." U.S. Const. amend. IV; N.J. Const. art. I, ¶7. But "[n]ot all police-citizen encounters constitute searches or seizures for purposes of the warrant requirement." State v Rodriquez, 172 N.J. 117, 125-26 (2002) (citing State v. Maryland, 167 N.J. 471, 483 (2001)).

Courts have recognized three types of encounters between police and citizens. The first is a field inquiry. Officers are permitted to make field inquiries "without grounds for suspicion." Maryland, 167 N.J. at 483 (quoting State v. Contreras, 326 N.J. Super. 528, 538 (App. Div. 1999)). If an officer initiates a field inquiry with an individual, "[t]he individual does not even have to listen to the officer's questions and may simply proceed on her own way." State v. Rosario, 229 N.J. 263, 271 (2017) (citing Florida v. Royer, 460 U.S. 491, 497-98 (1983)). "Because a field inquiry is voluntary and does not effect a seizure in constitutional terms, no particular suspicion of criminal activity is necessary on the part of an officer conducting such an inquiry." Id. at 272 (citing State v. Elders, 192 N.J. 224, 246 (2007)).

The second, more intrusive police-citizen encounter is an investigative detention, sometimes called an investigatory stop or a Terry[1] stop. An investigative detention is a seizure in constitutional terms. Rosario, 229 N.J. at 272; State v. Stovall, 170 N.J. 346, 356 (2002). "A police officer may conduct an investigatory stop if, based on the totality of the circumstances, the officer had a reasonable and particularized suspicion to believe that an individual has just engaged in, or was about to

---

[1] Terry v. Ohio, 399 U.S. 1 (1968).

engage in, criminal activity." Stovall, 170 N.J. at 356 (citing Terry, 392 U.S. at 21).

The third and most intrusive police-citizen encounter is an arrest. An arrest "requires probable cause and generally is supported by an arrest warrant or by demonstration of grounds that would have justified one." Rosario, 229 N.J. at 272 (citing State v. Brown, 205 N.J. 133, 144 (2011)).

In the case before us, defendant argues that his encounter with police was from its outset an investigatory stop. The State disagrees, contending the encounter began as a field inquiry. The trial court agreed with defendant. The court's decision is amply supported by the record.

"Whether a detention has occurred is measured from the citizen's perspective." Maryland, 167 N.J. at 483 (citing State v. Tucker, 136 N.J. 158, 165-66 (1994)). For that reason, an officer's conclusory statements that he merely intended to conduct a field inquiry or that a citizen was free to leave are "not probative." Ibid. Rather, whether a street encounter between an officer and a citizen is a field inquiry or an investigative detention "always comes down to whether an objectively reasonable person would have felt free to leave or to terminate the encounter with police." Rosario, 229 N.J. at 273.

Here, seven officers in several vehicles stopped along a curb near or adjacent to the sidewalk where defendant was walking. At least four officers wearing bullet proof vests marked with indicia that they were police exited the vehicles and approached defendant, upon whom they focused. Indeed, other than defendant's companion, there is no evidence that other civilians were in the immediate vicinity. In addition, Detective Diaz and the other officers stood close enough to defendant so they could reach him if he attempted to flee in any direction.

The totality of these circumstances supported the trial court's conclusion this encounter was an investigatory stop. A person lawfully walking down the street who suddenly finds himself the focus of multiple law enforcement officers wearing bullet proof vests, who have just arrived in several vehicles, stopped, approached him, and positioned themselves so that he could be detained if he attempted to leave, would not reasonably feel free to leave. We find no error in the trial court's conclusion that, from the outset, the encounter was an investigatory stop.

The question thus presented is whether the law enforcement officers had a "reasonable and particularized suspicion that [defendant had] just engaged in, or was about to engage in, criminal activity." Rosario, 229 N.J. at 272 (alteration in original) (quoting Stovall, 170 N.J. at 356). The officers based

13

their suspicion of defendant's criminal activity on a tip received from a police informant.

Courts analyze the reliability of a confidential informant's tip under a "totality of the circumstances test." State v. Smith, 155 N.J. 83, 92 (1998). "An informant's 'veracity' and 'basis of knowledge' are two highly relevant factors under the totality of the circumstances. State v. Zutic, 155 N.J. 103, 110 (1998) (citing Smith, 155 N.J. at 93). Neither factor, in and of itself, is indispensable to a finding of reliability. "A deficiency in one of those factors 'may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability.'" Id. at 110-11 (quoting Illinois v. Gates, 462 U.S. 213, 233 (1983)).

An informant's veracity can be supported by his or her past reliability. Id. at 111. "[I]f the informant does not identify the basis of knowledge, a reliable basis of knowledge may nonetheless be inferred from the level of detail and amount of hard-to-know information disclosed in the tip." Ibid. (citing Smith, 155 N.J. at 95). "[T]he nature and details revealed in the tip may imply that the informant's knowledge of the alleged criminal activity is derived from a trustworthy source." Smith, 155 N.J. at 94; accord, State v. Novembrino, 105 N.J. 95, 113 (1987) (quoting Spinelli v. U.S., 393 U.S. 410, 416 (1969)). An

14

informant's knowledge can also be inferred from the informant's prediction of "hard-to-know <u>future</u> events."  <u>Smith</u>, 155 N.J. at 95.

In the case before us, Detective Diaz's reasonable suspicion was based upon information provided by a reliable informant.  The informant gave a detailed description of defendant and his companion, information officers corroborated immediately when they arrived at the location the informant had described, a location known to police as a site of criminality and violence.  The informant's proven record of reliability, the accuracy of his description of defendant, the character of the neighborhood known to police, and the detective's experience combined to establish a reasonable suspicion to justify Detective Diaz in performing a <u>Terry</u> stop and frisk.  <u>See</u> <u>Zutic</u>, 155 N.J. at 113 ("If the police also had reasonable articulable suspicion that defendant was armed and dangerous, that . . . could support a protective search" (citing <u>State v. Arthur</u>, 149 N.J. 1, 12 (1997))).  Defendant "blading" his right side, disregarding an order from Detective Diaz, and reaching toward his pocket virtually compelled the officer to conduct a protective pat down for his safety and that of his fellow officers.  We find no reason to disturb either the trial court's findings or its legal conclusions.

In his second argument, defendant contends he was not awarded proper gap-time credits. The State does not oppose a remand for the purpose of computing those credits. Hence, we remand the case for that purpose.

Remanded for the determination of gap-time credits. Defendant's conviction and sentence are affirmed in all other respects.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION