**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2958-15T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

DWIGHT M. NELSON,
a/k/a NELSON DWIGHT,

    Defendant-Appellant.

_____

Submitted June 1, 2017 — Decided August 15, 2017

Before Judges Fuentes and Gooden Brown.

On appeal from Superior Court of New Jersey,
Law Division, Union County, Indictment No. 15-
02-0113.

Joseph E. Krakora, Public Defender, attorney
for appellant (Amira Scurato, Assistant Deputy
Public Defender, of counsel and on the brief).

Grace H. Park, Acting Union County Prosecutor,
attorney for respondent (Meredith L. Balo,
Special Deputy Attorney General/Acting
Assistant Prosecutor, of counsel and on the
brief).

PER CURIAM

Defendant pleaded guilty to first degree possession of marijuana with intent to distribute, N.J.S.A. 2C:35-5a(1), in a quantity over twenty-five pounds, N.J.S.A. 2C:35-5b(10)(a), to be treated as a second degree offense for the purpose of sentencing.[1] Consistent with the terms of the plea agreement, the court sentenced defendant to a term of six years with twenty-seven months of parole ineligibility and imposed the mandatory fines and penalties.

Pursuant to Rule 3:5-7(d), defendant now appeals from the trial court's order denying his motion to suppress the marijuana that formed the evidential basis for his conviction. The New Jersey State Police (NJSP) arrested defendant and impounded his car after a sniff-search conducted by a canine unit that was brought to the scene of the motor vehicle stop. Defendant argues: (1) the NJSP did not have a reasonable articulable suspicion to stop his car or conduct the sniff-search; and (2) even if the

---

[1] At the plea hearing, the prosecutor stated: "Mr. Nelson will plead guilty to . . . Count 2 of the indictment, a crime of the first-degree amended to a crime of the second-degree for sentencing purposes." (Emphasis added). This phraseology implies defendant pleaded guilty to a second degree offense. To avoid any ambiguity or misunderstanding in the future, we suggest the following language: "Defendant will plead guilty to the first offense of _____, to be treated as a second degree offense for purposes of sentencing." We note the trial judge used a version of the phraseology we suggested in the judgment of conviction.

initial motor vehicle stop was lawful, the use of the canine unit unreasonably prolonged his detention.

We reject defendant's arguments and affirm substantially based on our Supreme Court's recent decision in State v. Dunbar, in which a unanimous Court held that police officers do not need a "particularized reasonable suspicion" to conduct a canine sniff during the course of a routine traffic stop "provided the canine sniff does not prolong the stop beyond the time required to complete the stop's mission." State v. Dunbar, _____ N.J. _____ (2017) (slip op. at 19; 23-24). Based on the motion judge's factual findings, we conclude the NJSP had a reasonable Title 39 enforcement basis to stop defendant's car. The record also shows the use of the canine unit did not prolong the stop more than reasonably required to complete its Title 39 enforcement mission.

We gather the following facts from the record developed at the evidentiary hearing conducted by the trial court to decide defendant's motion to suppress.

NJSP Detective Jason Kazan testified that on October 10, 2014, the NJSP received "intelligence" from the Alcohol Tobacco and Firearm (ATF) that an anonymous source had provided information that "there would be a vehicle, described the Infinity, registration, who was driving, carrying a large sum of marijuana."

When asked to clarify, Kazan confirmed that the "information" consisted only of "the make, model, and tag number of the vehicle."

When asked about the driver, Kazan replied: "I believe they said there was a black male driving at the time. But other than that, nothing." The ATF anonymous source also stated that the vehicle would be departing from New York and traveling south on the New Jersey Turnpike toward Philadelphia. Based on this information, Kazan and two other NJSP detectives left the NJSP Cranbury Barracks and "went out in an unmarked vehicle and attempted to intercept that vehicle on the Turnpike." Kazan testified that twenty to thirty minutes after leaving the Barracks, they located an "Infinity FX35 . . . sport utility vehicle" heading southbound on the Turnpike. It was approximately 6:43 p.m. at the time. Kazan gave the following account of what occurred next.

> Q. What did you do when you found the vehicle?
>
> A. We located the vehicle and conducted a motor vehicle stop.
>
> Q. And when you stopped the vehicle did [its] registration match that of the information given to you by the ATF?
>
> A. Yes, it did.
>
> Q. Did any other information line up with the tip that you received?
>
> A. The make of the vehicle, the model, and the occupant.

Kazan identified defendant as the driver of the car. According to Kazan, "when I spoke to Mr. Nelson he was extremely nervous. He was shaking, trembling, [and] he started to sweat. The interior of the vehicle was void [of] any kind of belongings that would indicate that he was traveling from one destination to another as in personal belongings." Kazan testified that he twice asked defendant about where he came from and where he was headed, and defendant changed his "story" the second time. Kazan also smelled the "overwhelming odor of air freshener" emanating from the vehicle. He also saw the air freshener product "Febreze" in several areas of the car. Kazan testified that based on his experience, air freshener products are commonly used to mask the smell of raw marijuana.

Kazan asked defendant for permission to search the car when he saw "two very large bundles" located "in the rear . . . cargo hold" of the vehicle. Defendant did not consent, so Kazan requested that a canine unit respond to the scene. Kazan explained:

> Q. And why did you request the canine?
>
> A. I had believed that there was a presence of narcotics . . . in the vehicle.
>
> Q. Can you discuss what factors went into your decision?

A.  There [were] eight factors[.][2]

        . . . .

It was the initial call received from the ATF.
It was the moving violations that we observed.
His . . . nervous behavior.  He was sweating
profusely, trembling hands.  The conflicting
trip itinerary that he had provided to us.
Again, . . . the vehicle was void of any kind
of personal belongings, even just a knapsack
for going from one destination to another
especially when you're visiting people.  Those
two large bags in the rear cargo hold.  His
previous admissions to us that he [had] been
arrested for narcotics, and . . . that
overwhelming odor of that masking agent which
would be air freshener.

Q. Thank you.  How long did it take for the
canine to arrive at the scene after it was
called?

A. I believe it was approximately . . . 20 to
30 minutes.  I would have to look at the
incident reports just to see that.

Kazan testified that the canine handler "ran his dog around the vehicle."  The dog then alerted the handler to the presence of narcotics by scratching "the rear cargo area near the bumper." Kazan considered the dog's reaction as probable cause to arrest defendant.  He next arrested defendant and towed the car to the Newark Station where it was secured until the court issued a search warrant to search the interior of the car.  A search conducted

---

[2] Because the witness struggled to recall the factors, he reviewed a copy of the report to refresh his memory.

pursuant to the search warrant revealed that the two large bundles located in the rear of the car contained approximately eighty pounds of marijuana. Kazan testified that he also cited defendant for three Title 39 violations: following another vehicle too closely, N.J.S.A. 39:4-89; unsafely changing lanes, N.J.S.A. 39:4-88(b); and operating a motor vehicle while in possession of narcotics. N.J.S.A. 39:4-49.1.

The motion judge found Kazan's testimony credible. The judge described the initial motor vehicle stop as falling within the purview of an investigatory or Terry stop,[3] which he found was "justified by a reasonable and articulable suspicion that criminal conduct was afoot . . . [based on] information from the ATF." The judge found the information the NJSP received from the ATF contained very specific details that the detectives visually corroborated before stopping defendant's car.

Against this record, defendant raises the following arguments.

> POINT I
>
> THE TRIAL JUDGE ERRED IN DENYING THE MOTION TO SUPPRESS AS THE DETECTIVE DID NOT HAVE REASONABLE AND ARTICULABLE SUSPICION THAT THE OCCUPANT OF THE CAR WAS ENGAGED IN CRIMINAL

---

[3] Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

ACTIVITY, AND THUS THE WARRANT GRANTING PERMISSION FOR THE SEARCH WAS THE FRUIT OF AN UNCONSTITUTIONAL ARREST AND SUBSEQUENT SEARCH. <u>U.S. CONST.</u>, AMENDS. IV, XIV; <u>N.J. CONST.</u>, ART. I, PAR. 7.

> A.   The Tip Had No Known or Verifiable Source.

> B.  The Stop was Illegally Prolonged in Order to Bring in a Canine for a Drug-Sniff.

Our standard of review of the motion judge's factual findings is well-settled. We are bound to uphold the motion judge's factual findings as long as they are supported by sufficient credible evidence in the record. <u>State v. Gonzalez</u>, 227 <u>N.J.</u> 77, 101 (2016). This deference stems from the motion judge's opportunity to develop a "'feel' of the case" by personally hearing and seeing the witnesses testify, something inherently denied to us as appellate judges. <u>State v. Elders</u>, 192 <u>N.J.</u> 224, 243-44 (2007).

However, "[d]eference ends when a trial court's factual findings are not supported by sufficient credible evidence in the record." <u>State v. S.S.</u>, ____ <u>N.J.</u> ____, ____ (2017) (slip op. at 27). We also do not defer to the trial judge's legal conclusions. <u>State v. Gorthy</u>, 226 <u>N.J.</u> 516, 530 (2016). We review legal decisions de novo. <u>State v. Tate</u>, 220 <u>N.J.</u> 393, 405 (2015).

With these principles in mind, we conclude the motion judge's factual findings are supported by competent evidence in the record.

In particular, we are bound by the judge's credibility findings as to NJSP Detective Kazan's testimony. However, we disagree with the judge's legal conclusion that the NJSP had a reasonable basis to stop defendant's car based exclusively on the anonymous tip received from the ATF. We reach this conclusion based on our Supreme Court's recent decision in State v. Rosario, _____ N.J. _____ (2017), in which the Court reviewed the propriety of an investigatory stop of a motorist based on an anonymous tip.

In Rosario, a Colts Neck Police Officer received an anonymous tip that on a particular date the defendant would be selling heroin from her home and "out of her 'older burg[undy] Chevy Lumina.'" Id. at 3. The tip included the defendant's home address. The anonymous caller also stated that the defendant "was making trips in the Lumina to drop off and pick up heroin from an address in Jackson Township." Ibid. The officer received this information "through a 'patrol notice' shared with officers at the beginning of each shift[.]" Ibid. Four days later, the officer saw a burgundy Chevy Lumina lawfully parked in front of the address the tipster gave as the defendant's residence. Id. at 3-4. "[N]either the lights nor the engine of the Lumina were activated[.]" Id. at 4.

Based only on this information, the officer parked his marked police car behind the defendant's car to prevent it from leaving,

and proceeded to conduct an investigatory detention. Ibid. The Rosario Court held that an investigatory detention constitutes a seizure under the Fourth Amendment because "'an objectively reasonable person' would feel 'that his or her right to move has been restricted.'" Id. at 10 (quoting State v. Rodriquez, 172 N.J. 117, 126 (2002)). Under the prevailing facts in Rosario, the Court was particularly critical of relying on an anonymous tip as a basis to conduct an investigatory stop.

> [A]n anonymous tip, standing alone, inherently lacks the reliability necessary to support reasonable suspicion because the informant's "'veracity . . . is by hypothesis largely unknown, and unknowable.'" (quoting Rodriquez, supra, 172 N.J. at 127-28). The fact that the tip accurately identified [the] defendant and her vehicle is of no moment because a tipster's knowledge of such innocent identifying details alone "does not show that the tipster has knowledge of concealed criminal activity." Florida v. J.L., 529 U.S. 266, 272, 120 S. Ct. 1375, 1379, 146 L. Ed. 2d 254, 261 (2000).
>
> [Id. at 16-17.]

Here, the anonymous tip the NJSP received from the ATF contained the same type of facially "innocent details" that standing alone does not show the ATF had knowledge of concealed criminal activity. We also expressly reject the notion that because the anonymous tip came from a federal law enforcement agency it should be viewed as inherently clothed with a mantle of

10

reliability. The anonymity of the informant and the failure to describe how the information was obtained are the key factors that undermine the tip's reliability. All we know here is that an unknown representative of the ATF passed on to the NJSP facially innocent details about a motor vehicle travelling on the Turnpike on a particular date and time. Standing alone, this information "inherently lacks the reliability necessary to support reasonable suspicion." Ibid.

Furthermore, as was the case with the defendant in Rosario, here defendant was also not free to leave once the NJSP directed him to stop his car. As the Court in Rosario noted: "'[A]s a practical matter, citizens almost never feel free to end an encounter initiated by the police.'" Id. at 12 (quoting Rodriquez, supra, 172 N.J. at 129). "Rather, such police activity reasonably would, and should, prompt a person to think that she must stay put and submit to whatever interaction with the police officer was about to come." Ibid.

The key difference between the facts in Rosario and the controlling facts here is the motion judge's acceptance of Kazan's testimony about the Title 39 violations. Specifically, the judge found:

> At approximately 6:43 p.m., [Kazan and the two other NJSP Detectives] observed a vehicle matching the description provided[] [by the

ATF] . . . traveling the speed limit, but failing to maintain its lane and failing to keep a safe following distance behind the vehicle in front of it. The troopers then initiated a motor vehicle stop.

The record shows defendant was issued three traffic summonses that correspond to these Title 39 violations.

Once the propriety of the stop is established, law enforcement agents do not need a "particularized reasonable suspicion" to conduct a canine sniff. State v. Dunbar, supra, slip op. at 19; 23-24. The Court in Dunbar adopted the United States Supreme Court's holding in Illinois v. Caballes, 543 U.S. 405, 408, 125 S. Ct. 834, 837, 160 L. Ed. 2d 842, 847 (2005), which held that "a dog sniff would not change the character of a traffic stop that is lawful at its inception and otherwise executed in a reasonable manner, unless the dog sniff itself infringed [upon the defendant's] constitutionally protected interest in privacy." State v. Dunbar, supra, slip op. at 17-18. The Court in Dunbar also made clear, however, that "an officer may not conduct a canine sniff in a manner that prolongs a traffic stop beyond the time required to complete the stop's mission, unless he possesses reasonable and articulable suspicion to do so." Id. at 25 (citing Rodriquez v. United States, 575 U.S. ___, __, 135 S. Ct. 1609, 1616, 191 L. Ed. 492, 500-01 (2015)).

A-2958-15T4

Here, the motion judge found defendant refused to sign a consent form permitting the NJSP to search his car at approximately 7:21 p.m. Kazan thereafter requested a canine unit to respond to the scene at approximately 7:27 p.m. The canine unit arrived at 7:58 p.m. The NJSP handler deployed the trained police dog "Katie" to conduct an exterior sniff-search of the car for the presence of narcotics. Katie alerted her handler of the presence of narcotics in the rear cargo door of defendant's car. Kazan arrested defendant on possession of an unknown quantity of a controlled dangerous substance. The entire canine sniff-search took approximately thirty-seven minutes. Under these circumstances, the motion judge found the canine search did not unreasonably prolong the Title 39 enforcement stop. Mindful of the Court's holding in Dunbar, we agree.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2958-15T4