**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5661-18

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

DARRELL K. RAINEY,

      Defendant-Appellant.

_____

Submitted January 19, 2021 – Decided March 10, 2021

Before Judges Currier and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment Nos. 14-02-0402 and 14-02-0403.

Joseph E. Krakora, Public Defender, attorney for appellant (Suzannah Brown, Designated Counsel, on the brief).

Theodore N. Stephens II, Acting Essex County Prosecutor, attorney for respondent (Hannah F. Kurt, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Darrell K. Rainey appeals from the May 16, 2019 order of the Law Division denying his motion for post-conviction relief (PCR) without an evidentiary hearing. We affirm the order in part, vacate the order in part, and remand for an evidentiary hearing.

I.

The following facts are derived from the record. Belleville police received a 9-1-1 call relaying second-hand information that the caller's neighbor had seen "a couple of . . . black guys with masks on their face[s]" wearing dark clothing and walking in and out of residential backyards on Heckel Street. The exact location of the sighting was unclear because the caller referenced the intersection of Cross Street and Heckel Street, two roads that do not intersect. The caller stated that the person who saw the men resided at 96 Heckel Street.

In response to that report, a dispatcher sent Officer Agosta to "Heckel Street and Cross, or near 96 Heckel Street" to look for "[t]wo black males with masks in the area . . . in the back of the . . . houses there." The dispatcher subsequently informed Agosta that "[C]ross doesn't go up that far," apparently a reference to the non-existent intersection reported by the caller. A number of other officers simultaneously responded to the area.

2

As the officers were heading to the scene, Officer Santos reported over the radio as follows:

> From a business on Brook. We see two males. One tall, one short and possibly one white with black hood, black- uh dark clothing. They were last seen going towards Bloomfield Avenue on Heckel about 15 minutes in the past. They were walking, uh, very quickly. He didn't see them doing anything at that time.

Agosta replied over the radio,

> All right, on the corner of Honiss and North 7th, I got two males that fit that description. One tall black male. One short, light skin Hispanic male. One wearing a hoodie.

The men Agosta saw did not match the second-hand physical description given by the 9-1-1 caller and relayed to the officers, given that only one of the men was black. In addition, they were not wearing masks or dark clothing and were not on or near Heckel Street. The tall black man seen by Agosta was later identified as defendant. He was wearing a light colored blue or grey sweatshirt and carrying a white pharmacy bag. Agosta testified that he interpreted the report from Santos to be a change in the earlier description of the men for whom the officers were searching.

Immediately after Agosta made his communication, Sergeant Schwint informed him over the radio that the men for whom the officers were searching

3

"should be walking northbound on Heckel" Street. The men stopped by Agosta were walking northbound on North 7th Street, five blocks from Heckel Street.

Agosta approached the men for the purpose of conducting an investigatory stop. They complied with the officer's direction to stop walking and approach him. A number of other officers arrived shortly thereafter. Agosta questioned defendant while another officer, Alessio, questioned the light-skinned Hispanic man. Alessio noticed a triangular bulge in the front pocket of defendant's sweatshirt, which caused the pocket to sag. He thought the bulge might be a weapon because the 9-1-1 caller reported that her neighbor saw men wearing ski masks when it was not cold out.

Alessio asked defendant, "what's that?" and attempted to pat him down in a protective frisk. Defendant backed away and brushed the officer's hand away twice before running away. Agosta chased defendant and observed him holding the pharmacy bag in his left hand and holding his abdomen with his right hand as he ran.

Agosta testified that during the chase he observed defendant toss a small black item over a fence into a residential backyard and discard the pharmacy bag at another residence. Defendant was apprehended when he attempted to climb over a fence. The officers recovered a loaded handgun with an obliterated

4

serial number where Agosta saw defendant toss a black item over a fence and a pharmacy bag containing twenty-five folds of heroin and dental hygiene products where he saw defendant discard a bag.

A grand jury indicted defendant, charging him with third-degree possession of a controlled dangerous substance (CDS), N.J.S.A. 2C:35-10(a); third-degree possession of a CDS with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and (b)(3); third-degree possession of a CDS with intent to distribute within 1000 feet of school property, N.J.S.A. 2C:35-7(a); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b); fourth-degree possession of a defaced firearm, N.J.S.A. 2C:39-3(d); second-degree possession of a firearm in the course of committing, attempting to commit, or conspiring to commit a CDS distribution offense, N.J.S.A. 2C:39-4.1(a); and fourth-degree obstruction of the administration of law, N.J.S.A. 2C:29-1. In a separate indictment, defendant was charged with second-degree possession of a weapon by a convicted felon, N.J.S.A. 2C:39-7(b).

Defendant was tried on third-degree possession of a CDS, second-degree unlawful possession of a weapon, fourth-degree possession of a defaced firearm, and fourth-degree obstruction of the administration of law. The circumstances

5

of the apparent pretrial dismissal of the remaining counts of the first indictment are not clear from the record.

At trial, defendant testified that on the date in question he was walking with two men he had recently met and that he intended to purchase a cellphone from one of the men. He testified that along the way he purchased dental hygiene products at a pharmacy, which he was carrying in a plastic bag, and had his old cellphone in the pocket of his sweatshirt. He denied being in possession of a weapon or heroin.

Defendant admitted that he backed away from Alessio and swatted his hand away when the officer wanted to pat him down. He also admitted that he ran away from the officer, who he said was making him nervous. He testified that he lost his cellphone during the chase and that the pharmacy bag got pulled from his arm as he was climbing over a gate.

During cross-examination, the assistant prosecutor posed the following questions to defendant:

> Q.    Now, this is the first time that you had ever seen any of these police officers, correct or ever met any of these officers?
>
> A.    Yes.
>
> Q.    So you never had any personal issue with any of these officers[?]

A-5661-18

A.     No.

Q.     So you don't have any knowledge as to any personal reason why these officers would just say that this handgun is yours, correct?

A.     No.

Q.     Now, did you file any complaints against the Belleville Police Department for just falsely accusing you of this handgun (sic)?

A.     No.

The jury found defendant guilty of all counts. He was then tried on the second indictment and found guilty of second-degree possession of a firearm by a convicted felon.

On the first indictment, the court sentenced defendant to an aggregate term of ten years of imprisonment, with a five-year period of parole ineligibility. On the second indictment, the court sentenced defendant to a five-year term of imprisonment, with a five-year period of parole ineligibility to run concurrent with the sentences on the first indictment.

On direct appeal, we affirmed defendant's convictions and sentences, but remanded the matter for correction of errors on the judgment of conviction. State v. Rainey, No. A-3141-15 (App. Div. Oct. 26, 2017). The Supreme Court denied certification. State v. Rainey, 232 N.J. 492 (2018).

7

Defendant thereafter filed an amended petition for PCR. He alleged that he was denied the effective assistance of counsel because his: (1) trial counsel failed to heed his written request to move to suppress the evidence because the officers lacked particularized suspicion to stop him and he was stopped solely based on his race; and (2) his trial and appellate counsel failed to object at trial or argue on appeal that the assistant prosecutor's question regarding his failure to file a complaint against the arresting officers violated his right to remain silent.[1]

The trial court issued a written opinion and order denying defendant's petition without holding an evidentiary hearing. The court held that defendant could not establish ineffective assistance of counsel because a motion to suppress, had it been made, would not have been successful. The court found that Agosta's investigative stop of defendant was constitutional because the officer acted pursuant to information relayed to him by two credible sources –

---

[1] Defendant's PCR petition also alleged his counsel was ineffective for not questioning the arresting officers regarding defendant's outstanding warrants. Defendant did not address this issue in his brief. We therefore deem any argument with respect to the issue waived. "[A]n issue not briefed is deemed waived." Pressler & Verniero, Current N.J. Court Rules, cmt. 5 on R. 2:6-2 (2020); Telebright Corp. v. Dir., N.J. Div. of Taxation, 424 N.J. Super. 384, 393 (App. Div. 2012) (deeming a contention waived when the party failed to include any arguments supporting the contention in its brief).

the concerned citizen whose second-hand report was transmitted via her neighbor's call to 9-1-1 and the radio transmission of Santos, which the court apparently interpreted as Santos's contemporaneous sighting of two men walking in the area. The court concluded it was reasonable for Agosta to have interpreted Santos's transmission as an update of the description of the men being sought. The court concluded defendant's "contention that he was stopped solely based on his race is an incorrect one" and that there were "specific and articulable facts" that in conjunction with "reasonable inferences" could have caused Agosta reasonably to suspect defendant of criminal wrongdoing. As a result, the court found that any evidence obtained as a result of the stop, including the evidence defendant abandoned during the chase, would not have been suppressed had such a motion been made.

In addition, the court concluded that defendant's election to testify subjected him to the assistant prosecutor's question regarding his failure to file false accusation charges against the officers. Citing N.J.R.E. 503(d), the court noted that defendant was subject to the rules of evidence permitting questions that raise doubt about a witness's credibility, such as the question posed by the assistant prosecutor. Thus, the court concluded, an objection at trial and argument on appeal challenging the question would not have been successful.

9

This appeal followed. Defendant raises the following argument for our consideration.

> THE PCR COURT ERRED IN DENYING THE PETITION WITHOUT AN EVIDENTIARY HEARING ON THE CLAIMS THAT TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO FILE A MOTION TO SUPPRESS PHYSICAL EVIDENCE AND FOR FAILING TO OBJECT TO CROSS-EXAMINATION OF [DEFENDANT], THE GOAL OF WHICH WAS TO IMPEACH HIM WITH HIS POST-ARREST SILENCE.

## II.

Under Rule 3:22-2(a), a defendant is entitled to post-conviction relief if there was a "[s]ubstantial denial in the conviction proceedings of defendant's rights under the Constitution of the United States or the Constitution or laws of the State of New Jersey[.]" "A petitioner must establish the right to such relief by a preponderance of the credible evidence." State v. Preciose, 129 N.J. 451, 459 (1992). "To sustain that burden, specific facts" which "would provide the court with an adequate basis on which to rest its decision" must be articulated. State v. Mitchell, 126 N.J. 565, 579 (1992).

The Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution guarantee criminal defendants the right to the effective assistance of counsel. State v. O'Neil, 219 N.J. 598, 610

10

(2014) (citing <u>Strickland v. Washington</u>, 466 U.S. 668, 686 (1984); <u>State v. Fritz</u>, 105 N.J. 42, 58 (1987)). To succeed on a claim of ineffective assistance of counsel, the defendant must meet the two-part test established by <u>Strickland</u>, and adopted by our Supreme Court in <u>Fritz</u>. 466 U.S. at 687; 105 N.J. at 58.

Under <u>Strickland</u>, a defendant first must show that his or her attorney made errors "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." 466 U.S. at 687. Counsel's performance is deficient if it "[falls] below an objective standard of reasonableness." <u>Id.</u> at 688.

A defendant also must show that counsel's "deficient performance prejudiced the defense[,]" <u>id.</u> at 687, because "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different[,]" <u>id.</u> at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the trial. <u>Ibid.</u> "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." <u>Id.</u> at 697; <u>State v. Marshall</u>, 148 N.J. 89, 261 (1997). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient

11

prejudice, which we expect will often be so, that course should be followed." Strickland, 466 U.S. at 697.

We review a judge's decision to deny a PCR petition without an evidentiary hearing for abuse of discretion. State v. Brewster, 429 N.J. Super. 387, 401 (App. Div. 2013) (citing Marshall, 148 at 157-58). A hearing is required only when: (1) a defendant establishes a prima facie case in support of PCR; (2) the court determines that there are disputed issues of material fact that cannot be resolved by review of the existing record; and (3) the court determines that an evidentiary hearing is required to resolve the claims asserted. State v. Porter, 216 N.J. 343, 354 (2013) (citing R. 3:22-10(b)). "A prima facie case is established when a defendant demonstrates 'a reasonable likelihood that his or her claim, viewing the facts alleged in the light most favorable to the defendant, will ultimately succeed on the merits.'" Id. at 355 (quoting R. 3:22-10(b)).

"[T]o establish a prima facie claim, a petitioner must do more than make bald assertions that he was denied effective assistance of counsel." Ibid. (quoting State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999)). A PCR petition must be "accompanied by an affidavit or certification by defendant, or by others, setting forth with particularity[,]" State v. Jones, 219 N.J. 298, 312 (2014), "facts sufficient to demonstrate counsel's alleged substandard

performance[,]" Porter, 216 N.J. at 355 (quoting Cummings, 321 N.J. Super. at 170); see also R. 3:22-10(c).

Having carefully reviewed the record in light of the applicable law, we conclude that the trial court mistakenly exercised its discretion when it denied defendant's allegations of ineffective assistance of counsel relating to the suppression motion without holding an evidentiary hearing.

Both the federal and state constitutions protect citizens against unreasonable searches and seizures. See U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7. The parties agree that Agosta's encounter with defendant was an investigatory stop, which constitutes a seizure under both the federal and state constitutions. An investigatory stop or detention, sometimes referred to as a Terry[2] stop, involves a temporary seizure that restricts a person's movement. A Terry stop implicates a constitutional requirement that there be "'specific and articulable facts which, taken together with rational inferences from those facts,' give rise to a reasonable suspicion of criminal activity." State v. Elders, 192 N.J. 224, 247 (2007) (quoting State v. Rodriguez, 172 N.J. 117, 126 (2002)). The State has the burden to establish that a stop was valid. State v. Mann, 203 N.J. 328, 338 (2010); State v. Pineiro, 181 N.J. 13, 20 (2004). If there was no

_____

[2] Terry v. Ohio, 392 U.S. 1 (1968).

reasonable suspicion of criminal activity to justify the stop, evidence discovered as a result of the stop is subject to exclusion. State v. Chisum, 236 N.J. 530, 546 (2019).

To determine whether reasonable suspicion existed, a judge must consider the totality of the circumstances, viewing the "whole picture" rather than taking each fact in isolation. State v. Nelson, 237 N.J. 540, 554-55 (2019) (quoting State v. Stovall, 170 N.J. 346, 361 (2002)). Investigative stops are justified "if the evidence, when interpreted in an objectively reasonable manner, shows that the encounter was preceded by activity that would lead a reasonable police officer to have an articulable suspicion that criminal activity had occurred or would shortly occur." State v. Davis, 104 N.J. 490, 505 (1986).

> A [judge] must first consider the officer's objective observations. The evidence collected by the officer is "seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement. [A] trained police officer draws inferences and makes deductions . . . that might well elude an untrained person. The process does not deal with hard certainties, but with probabilities." Second, a [judge] must determine whether the evidence "raise[s] a suspicion that the particular individual being stopped is engaged in wrongdoing."
>
> [Id. at 501 (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)) (alterations in original) (citations omitted).]

14

As noted above, defendant did not match the second-hand description of suspicious men given by the 9-1-1 caller and relayed to the officers. He was not dressed in dark clothing, wearing or in possession of a mask, accompanied by another black man, walking on or near Heckel Street, or situated in or near a residential backyard. The only characteristic of defendant that matched the description given to the 9-1-1 dispatcher was his skin color. The trial court concluded that despite these circumstances, the stop was constitutional because Agosta reasonably believed that the description of the men for whom he was searching had been changed by Santos's radio transmission.

Yet, Santos's transmission suffers from a number of ambiguities. He began his transmission with "[f]rom a business on Brook." It is not clear if he is transmitting his report from a business, possibly on a street named Brook, or if he obtained information from a business on Brook Street. He then states that "[w]e see two males[,]" which suggests that he and one or more other people are then presently observing the males. However, he then says "[t]hey were last seen . . . about 15 minutes in the past" on Heckel Street going towards Bloomfield Avenue, which suggests that he is reporting a second-hand observation of another person from fifteen minutes earlier. The latter interpretation of the officer's transmission is supported by his subsequent

15

statement that "[h]e didn't see them doing anything at that time." Notably, Santos's transmission, whether it describes his personal observation or the second-hand report of one or more others from fifteen minutes early, describes the conduct of the men as "walking . . . very quickly" and not "doing anything[,]" acts that do not, standing alone, suggest criminal activity.

In light of these ambiguities, and given that Agosta conceded that he stopped defendant because he matched the description given by Santos, and not the description relayed to him by the 9-1-1 dispatcher, it was a mistaken exercise of the trial court's discretion to deny defendant's PCR petition without holding an evidentiary hearing. We therefore vacate the May 16, 2019 order to the extent that it denied defendant's PCR petition as it relates to trial counsel's failure to make a suppression motion and remand for an evidentiary hearing on that claim.

We offer no view on the outcome of defendant's claim and leave to the trial court the discretion to determine the parameters of the evidentiary hearing on remand. We note, however, that in order to decide whether a motion to suppress would have been successful the trial court must assess the credibility and reasonableness of Agosta's claim to have believed that the description of the men for whom he was searching had changed as a result of Santos's transmission, particularly in light of the transmission's ambiguities and lack of a description

16

of suspicious activity. In addition, it may be helpful to the resolution of this matter for the parties to develop a record with respect to the meaning of Santos's transmission, how he obtained the information he was transmitting, and the geographic distance between the reported sighting of two men "[f]rom a business on Brook" and the location at which Agosta stopped defendant. The record suggests defendant was stopped by Agosta approximately five blocks from Heckel Street, where the caller reported her friend had seen suspicious activity, but the distance between the stop and the business location on Brook from which Santos apparently made his transmission does not appear to have been established.

Furthermore, if the court determines that a suppression motion would likely have been successful, it will be necessary for the court to consider whether defendant's counsel simply failed to identify the possibility of making such a motion, or considered a motion, and decided for strategic, or other reasons, not to file it. The record suggests defendant wrote to his counsel requesting that a motion to suppress be filed. His counsel's response, if any, may be illuminating.

We have also considered defendant's claim to have been denied the effective assistance of counsel as a result of the failure of trial counsel to object to the assistant prosecutor's question regarding defendant having not filed a

17

complaint against the arresting officers for making a false claim. We find no basis to disturb the trial court decision to the extent that it denies that claim without an evidentiary hearing. Defendant's arguments on this point lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed in part, vacated in part, and remanded for an evidentiary hearing consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION