**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2030-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

GUY C. JACKSON,

    Defendant-Appellant.

_____

Argued March 5, 2025 – Decided July 14, 2025

Before Judges Gummer and Jablonski.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 18-08-1159.

Tamar Y. Lerer, Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Tamar Y. Lerer, of counsel and on the briefs).

Anthony J. Robinson, Assistant Prosecutor, argued the cause for respondent (Yolanda Ciccone, Middlesex County Prosecutor, attorney; Anthony J. Robinson, of counsel and on the brief).

PER CURIAM

Defendant Guy C. Jackson appeals from an order denying his motion to suppress evidence seized during the warrantless search of his car and its glove compartment. Following the denials of that motion and two subsequent motions for reconsideration, defendant pled guilty to second-degree possession with intent to distribute heroin in a quantity of one-half ounce or more, but less than five ounces, N.J.S.A. 2C:35-5(a)(1) and 2C:35-5(b)(2); second-degree possession with intent to distribute cocaine in a quantity of one-half ounce or more, but less than five ounces, N.J.S.A. 2C:35-5(a)(2) and 2C:35-5(b)(2); and third-degree financial facilitation of criminal activity, N.J.S.A. 2C:21-25(a). After reviewing the record, we conclude both the original stop of defendant and the subsequent search of defendant's car were improper and the court should have suppressed the evidence that flowed from those constitutional infractions.

Accordingly, we reverse the order denying defendant's motion to suppress the evidence, vacate his guilty plea, and remand for proceedings consistent with this opinion.

I.

We take these facts from the record of the motion to suppress.

In 2013, Detective Joseph Gougeon of the Old Bridge Police Department launched an investigation into heroin trafficking in that community. His scrutiny centered on Nicholas Zaffarese, who was identified by a confidential informant ("CI") as a central distributor in a drug-dealing scheme. That CI told police that Zaffarese's supplier was "Big Mike," and "Big Mike" drove a black Honda into New Jersey daily to deliver 100 bricks of heroin. Sergeant Peter LoPresti, also an Old Bridge detective, informed Detective Gougeon that "Big Mike" was an alias that defendant used. Sergeant LoPresti based this knowledge on an interaction he had with defendant a decade earlier.

From multiple sources, including photograph identifications and community tips, police discovered more links between "Big Mike" and local heroin sales. Specifically, CIs connected him to specific heroin branded as "dog food." This connection was corroborated by observed controlled buys and heroin seizures involving Zaffarese in which the heroin was labeled with a "dog food" stamp, and a CI's tip that Jackson often stamped his drug packages with that same "dog food" label. Surveillance and communications data indicated that Zaffarese visited defendant's business, Phaze 1 AutoSports ("Phaze 1"), on a near daily basis. Additionally, on viewing a printed copy of defendant's driver's license photo, a CI identified defendant as "Big Mike."

3

Defendant was also linked to other participants in the drug trafficking scheme. Specifically, a suspected dealer named Dave Mundy became a subject of the investigation when Zaffarese's phone records revealed the two were in frequent contact. According to a CI, Mundy's supplier was a black male from Red Bank named "Guy" whom Mundy had met at Phaze 1.

Ultimately, Detective Gougeon began direct surveillance of Mundy between December 2013 and March 2014 and observed at least four drug transactions in which Mundy was directly involved. The police also tracked Mundy's phone. As a result of these observations, Detective Gougeon applied for and obtained a search warrant for Mundy's person.

On March 19, 2014, Detective Gougeon and Detective Montagna staked out Mundy's residence to execute the warrant. Detective Montagna conducted "moving surveillance" by driving around the property while Detective Gougeon remained parked in his pickup truck in the residential complex's parking lot. The two detectives visually located Mundy and watched him drive away in a white Kia. Shortly afterwards, a silver Mazda parked "in the spot one over" from Detective Gougeon's pickup truck. Mundy returned in his Kia and parked close to the Mazda and to Gougeon.

4

Detective Gougeon observed Mundy exit his car and approach the Mazda's driver. He heard Mundy say, "nice car or something to that effect." Detective Montagna then approached in his vehicle, and Detective Gougeon observed Mundy pull cash out of his right pocket. Montagna drove up immediately and blocked the silver Mazda. Mundy returned the cash to his pocket and took steps backward from the Mazda. He did not attempt to flee the scene.

Detective Gougeon approached the driver's side of the Mazda and observed the occupants of that car for the first time: a black male driver and a female passenger. As he walked up, he noticed the driver reach for the keys and turn them forward "as if he was going to start the car to leave." Yet, the driver did not attempt to escape. Detective Gougeon recognized the Mazda's occupants as defendant and his spouse, Lashawn Mealing.

After confirming their names, Detective Gougeon ordered the pair to exit the car and directed defendant to step to the back of the car and to place his hands on the trunk. When Mealing complained of leg pain, Detective Gougeon permitted her to re-enter the car. When he opened the car door for her, he detected the odor of marijuana from inside the car.

A-2030-22

Detective Montagna searched Mundy and found $3,117 in cash in his pants pocket. All the parties were Mirandized.[1] In response to separate inquiries about the purpose of their presence in the area, Mundy's account differed from defendant's. Specifically, Mundy informed the police that he intended to purchase a car. Defendant, on the other hand, reportedly was selling car parts. The officers then requested permission to search defendant's car. Defendant declined. As a result, Detective Gougeon sought a telephonic search warrant for defendant's car.

Concurrently, and notwithstanding the fact that the warrant had not yet been obtained, Sergeant LoPresti, who had just arrived on scene, continued the investigation into the car. Sergeant LoPresti asked defendant for his driver's license, registration, and insurance card. This information, according to Sergeant LoPresti, was needed because the car displayed temporary paper tags that did not generate a vehicle identification number ("VIN") when the tag numbers were investigated. When asked why he had sought the registration and insurance information, he responded: "It's to make a nicer package to present to the [j]udge. It's more detailed, you can match the registration with

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

 A-2030-22

the actual VIN number on the vehicle.  You can just do a better investigation by having the documentation."

Sergeant LoPresti did not attempt to locate the car's VIN on the dashboard although he was aware that every car has a VIN engraved in the dashboard.  He also did not advise defendant that he had a right to refuse to allow the officer to retrieve the registration.  On cross-examination, Sergeant LoPresti testified:

> Q:  And regardless of whether or not you knew who owned the car or who the car was registered to there was going to be an attempt to get a search warrant, correct?
>
> A:  That's correct.
>
> Q:  So if no documentation had been recovered you were still going to do that, correct?
>
> A:  Absolutely.  Well, I was not going to, but that would be my advice.

Defendant ultimately provided his driver's license and also told Sergeant LoPresti that his registration and insurance information were in either the glove box or the car's armrest.  On direct examination, Sergeant LoPresti testified:

> Q:  Did you ask [defendant] to retrieve the registration and the insurance?

A:     No, I did not.

Q:     Why not?

A:     From prior dealings with [defendant] I wasn't going to let him back into the vehicle.

Q:     What do you mean when you –

A:     For my safety.  I don't know what's in the glove box at that point, I've already had an arrest involved with him with a handgun.  I was not letting him, for my safety I was not going to let him go into the glove box of the vehicle, not at that time.

Without permission, Sergeant LoPresti opened the glove box and immediately saw "what [he] believed to be heroin packets in wrapped up newspapers and with rubber bands in bundles" in an unzipped leather document bag.  He also noticed the smell of raw marijuana coming from the glove box.  He retrieved the registration and insurance information by slipping them out from underneath the leather document bag.  Although he testified that he did not manipulate the leather bag, he later admitted he had pushed the bag upwards to retrieve the papers that were sticking out from underneath the bag. Defendant and Mealing were arrested and "a large amount of money" was found in defendant's pocket.

During this time, Detective Gougeon was still attempting to obtain the warrant.  Sergeant LoPresti informed him about the existence of the purported

contraband in the glove box. To substantiate the request for the warrant, Detective Gougeon combined the information that he already had about Mundy from the existing search warrant of Mundy's person, along with the conflicting accounts about the purpose of the meeting between Mundy and defendant, and the money found on defendant's person. But Detective Gougeon did not tell the judge who issued the warrant about the smell of marijuana emanating from the car, despite his earlier detection of it, nor did he provide information about the contraband found by Sergeant LoPresti. When asked at the suppression hearing why he had failed to provide the warrant judge with this important piece of information about allegedly criminal behavior, Detective Gougeon explained he had not done so because "[he] felt [they] had enough probable cause based on [Sergeant LoPresti's] observation." In the application, Detective Gougeon also omitted information regarding the circumstances of the search of the glove box for defendant's registration and insurance information. He also did not tell the warrant judge that defendant had not consented to a search of his car and that defendant was not provided an opportunity to retrieve his registration and insurance card himself.

A-2030-22

On this information, the judge authorized the warrant.  The resulting search of the car revealed cocaine, heroin, marijuana, cash and drug paraphernalia.

Defendant was indicted on various drug-related charges and moved to suppress the evidence Sergeant LoPresti had discovered in the glove box.  At the suppression hearing, the motion judge noted his "credibility issues" about the truthfulness of Sergeant LoPresti's testimony that he had smelled "an odor of raw marijuana," when the marijuana was sealed in a bag:

> But, I mean, I've got to tell you, if you take out the odor of marijuana – [a]gain, I'm just talking about the inevitable discovery, not whether or not there was a right to get into that glove compartment, or whether that was proper.
>
> But if you take out the odor of marijuana, I mean, I've got to tell you, if that came to me, I would be a little hard pressed to sign off on that warrant, without anything more than that.

Notwithstanding this observation, the motion judge denied defendant's motion concluding it was reasonable for the officers to stop defendant because this encounter would be considered an investigative seizure.  The judge also found that there were articulable facts supporting a reasonable suspicion to stop defendant's car for a violation of law, and specifically, "the fact that Mundy could not have acted alone in this transaction demonstrates that the

10

officers reasonably suspected both Mundy and the vehicle's occupants of engaging in criminal activity." Moreover, the judge found it was reasonable for the officers to order defendant out of the car based on his decades-old prior interaction with Sergeant LoPresti.

As for the glove compartment search, the judge held that defendant providing the location of the registration and insurance information in answer to the request to produce them was reasonably considered as defendant's consent to a limited search for these administrative items. Further, the judge found that it was reasonable to not allow defendant to retrieve the documents himself because of Sergeant LoPresti's concern about his safety stemming from defendant's prior involvement with Sergeant LoPresti

Finally, the motion judge resolved his expressed concern about the "credibility issue" in favor of the State, finding that the inevitable-discovery doctrine applied. The judge reasoned, because the police were already seeking a warrant based on sufficient probable cause, the discovery of the physical evidence in defendant's car was inevitable.

After the judge denied defendant's motion and two subsequent reconsideration applications, defendant pled guilty possession of heroin with the intent to distribute it, N.J.S.A. 2C:35-5(a)(1) and 2C:35-5(b)(2); second-

degree possession with intent to distribute cocaine, N.J.S.A. 2C:35-5(a)(2) and 2C:35-5(b)(2); and third-degree financial facilitation of criminal activity, N.J.S.A. 2C:21-25(a). On the State's motion, the court dismissed the financial-facilitation conviction. On the remaining convictions, defendant was sentenced to concurrent fifteen-year prison terms with seven and one-half years of parole ineligibility.

Defendant appeals from the from the October 17, 2022 judgment of conviction, the January 20, 2016 order denying the suppression motion, and the August 24, 2018 and June 26, 2019 orders denying the reconsideration motions.[2] He presents two issues for our consideration:

POINT I

THE STOP AND SEARCH OF THE DEFENDANT WERE ILLEGAL.

A.    The initial stop of the defendant was illegal.

B.    It was unlawful to search the car for the registration.

---

[2]    The June 24, 2019 order also contains a provision denying defendant's motion to dismiss the indictment. Defendant did not brief that issue and, thus, waived it. N.J. Dep't of Env't Prot. v. Alloway Twp., 438 N.J. Super. 501, 505 n.2 (App. Div. 2015) (finding "[a]n issue that is not briefed is deemed waived upon appeal").

C.      The unlawful search cannot be saved by resort to the inevitable discovery doctrine.

D.      The evidence must be suppressed.

POINT II

DEFENDANT'S SENTENCE IS EXCESSIVE.

II.

Both the United States Constitution and the New Jersey Constitution protect individuals from "'unreasonable searches and seizures' by government officials." State v. Hagans, 233 N.J. 30, 38 (2018) (quoting State v. Watts, 223 N.J. 503, 513 (2015)). Warrantless searches and seizures are "presumptively unreasonable and therefore invalid." State v. Elders, 192 N.J. 224, 246 (2007). The State must prove the validity of its actions in the chain of events. See ibid. ("[T]he State bears the burden of proving by a preponderance of the evidence that a warrantless search or seizure 'falls within one of the few well-delineated exceptions to the warrant requirement.'" (quoting State v. Pineiro, 181 N.J. 13, 19 (2004))).

When we review a trial court's factual findings in the context of a motion to suppress evidence in a criminal case, we are bound to uphold those factual conclusions if they are "supported by sufficient credible evidence in the record." State v. Scriven, 226 N.J. 20, 40 (2016). We may reject them only if

13

they are "so clearly mistaken 'that the interests of justice demand intervention and correction.'" State v. Goldsmith, 251 N.J. 384, 398 (2022) (quoting State v. Gamble, 218 N.J. 412, 425 (2014)). In contrast, our review of legal conclusions drawn from those facts is de novo. State v. Radel, 249 N.J. 469, 493 (2022); see also Gamble, 218 N.J. at 425 ("A trial court's interpretation of the law . . . and the consequences that flow from established facts are not entitled to any special deference."). Therefore, we consider the trial court's determination of whether an exception to the exclusionary rule applies to be a legal conclusion which we will examine with a fresh set of eyes. See State v. S.S., 229 N.J. 360, 380 (2017).

In this matter, the totality of the information possessed at the time of the initial encounter between defendant and the police did not amount to an objectively reasonable and articulable suspicion that defendant was engaged in any criminal activity. Because the initial investigatory detention of defendant was improper, it was similarly unlawful for the police to search the car, even for the registration and insurance information. These unconstitutional actions cannot be saved by the inevitable-discovery doctrine.

A.

Two police-citizen encounters always require constitutional justification: arrests and investigative detentions.  State v. Nishina, 175 N.J. 502, 510-11 (2003).  First, the police may arrest someone only if they have probable cause to do so, and second, they may stop a person suspected of criminal activity for brief investigatory questioning only if they have an articulable, reasonable basis for that suspicion.  Florida v. Royer, 460 U.S. 491, 497-99 (1983); State v. Maryland, 167 N.J. 471, 486-87 (2001).  The issue raised in this appeal is whether the investigating officers possessed objectively reasonable suspicion defendant was engaged in criminal activity at the time of their initial encounter with defendant.  We conclude they did not.

"An 'investigatory stop' permits law enforcement officers to detain an individual temporarily for questioning."  Maryland, 167 N.J. at 486.  However, this reasonable-suspicion standard requires "some minimal level of objective justification for making the stop."  Nishina, 175 N.J. at 511 (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)).  An investigatory stop "may not be based on arbitrary police practices, the officer's subjective good faith, or a mere hunch."  State v. Shaw, 237 N.J. 588, 612 (2019) (quoting State v. Coles, 218 N.J. 322, 343 (2014)).  Where the lawfulness of an investigatory stop is

15

challenged, the State bears the burden of showing "the stop was 'based on specific and articulable facts which, taken together with rational inferences from those facts, give rise to a reasonable suspicion of criminal activity.'" State v. Alessi, 240 N.J. 501, 518 (2020) (quoting State v. Mann, 203 N.J. 328, 338 (2010)).

To determine if an investigative detention is justified under this standard, "a court must consider 'the totality of the circumstances—the whole picture.'" State v. Stovall, 170 N.J. 346, 361 (2002) (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)). Because an investigatory stop must have an objective justification, "raw, inchoate suspicion grounded in speculation cannot be the basis for a valid stop." Scriven, 226 N.J. at 34. "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion required is 'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause." Gamble, 218 N.J. at 428 (citation omitted) (quoting Sokolow, 490 U.S. at 7). "Although the bar is low, it is a bar nonetheless, and the State must provide evidence to support the reasonableness of the suspicion that led to the stop that can be tested through the adversarial process." State v. Atwood, 232 N.J. 433, 448 (2018).

A-2030-22

Applying these principles to the matter before us, we conclude the investigative detention at the time of the encounter between the officers and defendant was unsupported by reasonable suspicion and, therefore, was unlawful. More specifically, we are satisfied that the police's suspicion of defendant, viewed objectively and in a totality, was based on little more than a hunch and does not represent the objective manifestation necessary to pass constitutional muster.

The police did not know the identity of the person with whom Munday spoke at the time of the encounter. Before the officers confronted Mundy and defendant, they did not observe any narcotics nor witness any money changing hands, which would have been characteristic of the hand-to-hand transactions Detective Gougeon previously observed. No traffic infractions were alleged nor observed. No informant's tip about a planned crime or drug transaction that involved Mundy and a co-conspirator existed. Finally, the singular remark Mundy made to the unidentified driver or occupant of the car specifically overheard by the officers was innocuous and innocent. From an objective standpoint, these facts did not suggest anything to reveal a criminal enterprise was afoot.

17

We are satisfied the officers' investigative stop was not supported by reasonable and articulable suspicion, and as a result, was constitutionally infirm. This illegal stop taints the entirety of the following interaction. Consequently, the fruit of that police activity must be suppressed. State v. Williams, 192 N.J. 1, 14 (2007); Wong Sun v. United States, 371 U.S. 471, 485 (1983).

## B.

Defendant further argues another unconstitutional intrusion occurred when the officers searched his glove box, and that intrusion cannot be cured under the "registration search exception" as set forth in State v. Terry, 232 N.J. 218, 242-43 (2018). He argues that because the occupants of the car were not given the opportunity to produce the registration before the officers searched for it, the search was constitutionally improper. We agree.

Our Supreme Court has repeatedly reaffirmed the registration-search exception (also known as the "credentials exception") that was first recognized in State v. Boykins, 50 N.J. 73, 77-78 (1967). See State v. Keaton, 222 N.J. 438, 448-50 (2015); Terry, 232 N.J. at 236-37. That narrow exception to the warrant requirement permits police officers to conduct a limited warrantless search of areas in a motor vehicle where registration papers are typically kept.

A-2030-22

<u>Terry</u>, 232 N.J. at 236-37.  The exception, however, applies only if a driver is unwilling or unable to provide proof of ownership when requested.  <u>Id.</u> at 237-39.

Recently, we considered the impact of <u>Terry</u> in <u>State v. Johnson</u>, 476 N.J. Super. 1 (App. Div. 2023), a case that factually parallels this matter.  In <u>Johnson,</u> the issue raised was "whether police may initiate a search under [the registration search] exception when (1) the detained motorist is outside the vehicle at the time of request for the registration certificate, and (2) the officer determines it would be unsafe to allow the motorist to reenter the vehicle to retrieve it."  <u>Id.</u> at 12.  Those are the exact factual circumstances of this case.  We held:

> After carefully examining the limiting principles announced in <u>Keaton</u> and re-affirmed in <u>Terry</u>, we conclude that providing a detained motorist a meaningful opportunity to produce the registration certificate is an indispensable prerequisite to conducting a registration search.  We decline to create a categorical exemption to that prerequisite when police determine, in the exercise of their discretion, it would be unsafe to allow a motorist to reenter the stopped vehicle.  Stated another way, we hold a motorist is not "unable" to produce a registration certificate within the meaning of the exception when the sole reason for that inability is a police officer's discretionary decision to prevent reentry.  We stress that given the imperative of protecting officer safety, the detectives in this case were permitted to place

19

defendant in the police car and prevent him from reentering the parked vehicle throughout the course of the investigative detention. That law enforcement decision, however, had the effect of foreclosing a warrantless registration search, requiring the detectives instead to use other methods to investigate whether defendant was in lawful possession of the vehicle, such as an [Motor Vehicle Commission] database look-up.

[Id. at 13.]

Sergeant LoPresti never provided defendant nor Mealing, the other occupant of the Mazda, any opportunity to retrieve the administrative documents he demanded. Rather, even though defendant refused consent to search the car and the telephonic warrant application was still proceeding, Sergeant LoPresti immediately opened the glove box to obtain the documents that defendant had told him were there and also discovered the contraband sought to be suppressed. Any concern LoPresti had about his own safety is belied by the fact that the passenger was in the car when he searched the compartment. Although Sergeant LoPresti was permitted to prevent defendant from reentering the car for his own safety, that decision precluded him from conducting a warrantless registration search and required him "to use other methods to investigate whether defendant was in lawful possession of the vehicle." Ibid.

C.

Finally, the State argues that even if no exception to the warrant requirement existed, the consideration of the contraband found in the glovebox would have been constitutionally permitted under the inevitable-discovery doctrine. We disagree.

The inevitable-discovery doctrine provides an exception to the general exclusionary rule that evidence obtained through an unlawful search may not be presented at trial. State v. Sugar, 100 N.J. 214, 236-38 (1985). To admit evidence under the exception, the State must prove, by clear and convincing evidence, that

> (1) proper, normal[,] and specific investigatory procedures would have been pursued in order to complete the investigation of the case; (2) under all of the surrounding relevant circumstances the pursuit of those procedures would have inevitably resulted in the discovery of the evidence; and (3) the discovery of the evidence through the use of such procedures would have occurred wholly independently of the discovery of such evidence by unlawful means.
>
> [Id. at 238.]

Because we have found the facts of this case do not establish any reasonable suspicion to believe that criminal activity was afoot at the time that the police encountered defendant initially, we also conclude the State cannot

21

meet its burden to show the car would have been searched using "proper, normal[,] and specific investigatory procedures" under the first prong of the <u>Sugar</u> test.

Additionally, the State cannot establish the entitlement to admit the evidence under the third prong of the <u>Sugar</u> test because the officer's warrant application omitted necessary information that should have been presented, in its entirety, to the warrant judge. Specifically, Detective Gougeon did not inform the warrant judge about his perception of the odor of marijuana in the car. Without that information, and excluding the information obtained through illegal means, no probable cause sufficient to issue a search warrant existed. The motion judge commented on this omission specifically in his decision and acknowledged at the motion hearing that it made the officer's credibility suspect.

In addition, Detective Gougeon, despite having informed the warrant judge that contraband was discovered in the glove box, did not provide the warrant judge with the information about the constitutionally suspect circumstances surrounding the discovery of that contraband. Given those omissions, the State failed to demonstrate the clear and convincing proof

necessary to trigger the admissibility of the evidence under the third prong of the inevitable-discovery doctrine.

## III.

In sum, we reverse the January 20, 2016 order denying the suppression motion and the denials of the reconsideration motions in the August 24, 2018 and June 26, 2019 orders. We vacate the October 17, 2022 judgment of conviction. We remand the case for proceedings consistent with this opinion. Because we vacated the judgment of conviction, we do not reach defendant's second argument challenging the excessiveness of his sentence.

Reversed in part; vacated in part; and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Hanley

Clerk of the Appellate Division

23